José Rodríguez López, demandante y apelante *v.* Municipio de Carolina, representado por su Alcalde Juan Osorio; y el Comisionado de lo Interior Sergio Cuevas, demandados y apelados.

Número 10681.

*Sometido:* 26 de enero de 1953. *Resuelto:* 23 de noviembre de 1953.

*David Curet Cuevas,* abogado del apelante; *Salvador Acevedo Colón* y *Rubén Gaztambide Arrillaga,* abogados del Municipio apelado; *Hon. Secretario de Justicia Víctor Gutiérrez Franqui* y *A. Torres Braschi* y *M. Rodríguez Alberty, Procuradores Auxiliares,* abogados del Comisionado de lo Interior apelado.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del tribunal.

El 26 de febrero de 1942 el contratista señor José Rodríguez López, firmó un contrato de obra pública con el Municipio de Carolina, para la construcción de dos pozos profundos que formarían parte del sistema de acueducto de dicho municipio, con una capacidad de cuatrocientos galones de agua por minuto, debiendo empezar la obra en o antes

del cuatro de mayo de 1942 y terminarla en o antes del cuatro de agosto de 1942. La inspección general de la obra estaría a cargo del anterior Comisionado del Interior de Puerto Rico.

El contrato especificaba que una vez terminada la construcción de ambos pozos, se procedería a la prueba preliminar de los mismos, debiendo suministrar el contratista para dicha prueba una bomba de pozo profundo con motor eléctrico o de gasolina y todo el equipo necesario para determinar el rendimiento de cada pozo y los niveles de agua correspondientes. El contrato también especificaba que al practicarse la prueba preliminar de rendimiento, se tomarían muestras de agua de cada pozo, las cuales serían sometidas al anterior Departamento de Sanidad Insular y examinadas en cuanto a su potabilidad para el consumo público. El contratista terminó la construcción de ambos pozos, y siguiendo las instrucciones especificadas en el contrato, los dejó sin sellar hasta que se realizaran las pruebas. El sello después de las pruebas consistía exclusivamente en un vaciado de hormigón sobre las venas superiores de cada pozo y en la colocación de las tapas correspondientes.

En presencia del señor Alcalde de Carolina y de uno de los ingenieros consultores del municipio, quien por cierto resultaba ser uno de los autores del proyecto, se procedió a la prueba preliminar de rendimiento. Es verdad que en esta prueba preliminar de rendimiento no estuvo presente el ingeniero inspector de la obra, quien de acuerdo con las "Instrucciones para los Licitadores" sería nombrado por el anterior Comisionado del Interior, de fondos del municipio disponibles al efecto, a través de la División de Obras Municipales del anterior Departamento del Interior. Pero no es menos cierto que el anterior Departamento del Interior nunca nombró ningún inspector para dicha obra, por no haber fondos disponibles y la única inspección que la misma tuvo fué la del Alcalde de Carolina y otros funcionarios de dicho municipio.

Cuando se hizo la prueba preliminar de rendimiento estaba en vigor el reglamento de la Oficina de Administración de Precios que racionaba la gasolina debido a la emergencia de guerra. Se consiguió un permiso para funcionar el equipo de las pruebas durante veinticuatro horas. La prueba preliminar de rendimiento se realizó por veinticuatro horas solamente, y de esto hay hasta evidencia fotográfica. De acuerdo con las "Condiciones Facultativas" del contrato, página 3, subtítulo "Prueba Preliminar", letra c, éste era el mínimo de tiempo de dicha prueba. Menos la presencia del inspector de obra, no hay más remedio que concluir, en cuanto a la prueba preliminar de rendimiento, que hubo un cumplimiento sustancial del contrato. El hecho de no haberse nombrado nunca el ingeniero inspector, por falta de fondos disponibles para tal fin, opera como una renuncia al derecho a dicha inspección: *Woodworth* v. *Hammond*, 27 N. W. 106, (*Reese*) (1886).

■ El verdadero problema surge con la prueba de la potabilidad. El contratista declara que la toma de muestras de agua la hizo un "ingeniero de Sanidad, un tal Ernesto Seijo." Lo primero que preguntó fué si habían esterilizado el sitio. Se le dijo que no porque no había "perchlorón", que es una substancia para eliminar las bacterias de las aguas y no había en toda la isla, *porque el barco que lo traía lo hundieron por ahí cerca.* Esta fué la información que nos dió la casa. Entonces el Municipio y el Departamento del Interior me dieron sesenta días para yo buscar el "perchlorón" con ayuda de ellos. El Alcalde estuvo conmigo en todas esas bases militares y en ninguna lo pudimos conseguir. Últimamente lo conseguimos en la Defensa Civil, dos latitas, pero no servía; el químico nos dijo que no servía, que no lo usáramos porque nos iba a infectar más el agua. Y eso fué lo único que faltó para el cumplimiento:" (transcripción de evidencia, página 76). La prueba de los demandados apelados en cuanto a este extremo, es una certificación negativa donde se dice, que en los archivos del anterior

484

Departamento de Sanidad no existe constancia oficial que se hubieran tomado muestras de agua para determinar la potabilidad, aunque un testigo de los demandados acepta, que había en el anterior Departamento de Sanidad un señor Rafael Seijo que se dedicaba a tomar muestras de agua para el Negociado de Saneamiento, (transcripción de evidencia página 105).

Examinando cuidadosamente las condiciones facultativas que forman parte del contrato en cuanto a la prueba de potabilidad de las aguas, nos encontramos con la siguiente disposición: "al practicarse la prueba preliminar, se tomarán muestras de agua de cada pozo cuyo rendimiento sea igual a, o mayor de la cantidad especificada, las que serán sometidas al Departamento de Sanidad Insular para su examen y aceptación en cuanto a la potabilidad y uso para consumo público. El Comisionado del Interior se reserva el derecho de aceptar con el consentimiento del Departamento de Sanidad, el agua de cualquier pozo que resulte potable, pero que tenga una ligera contaminación susceptible de ser corregida eficazmente mediante una dosificación de cloro, que no exceda de cuatro (4) libras por millón de galones de agua, para que sea aceptable, en todos sentidos, para el consumo humano. *En dicho caso, el gobierno insular suplirá un equipo para la cloración de las aguas* y el contratista suministrará *el mismo equipo usado para las pruebas de rendimiento de agua* y lo operará durante un período de 24 a 48 horas, para que el Departamento de Sanidad tome las muestras de agua necesarias para ser analizadas a los efectos de su aceptación. *Queda entendido que la aprobación del agua de los pozos por el Departamento de Sanidad Insular es un requisito indispensable para la aceptación de los mismos por el Departamento del Interior de Puerto Rico.*"

Partiendo del supuesto que la muestra de agua tomada durante la prueba preliminar de rendimiento resultara ligeramente contaminada, si el Comisionado del Interior, con el

consentimiento del Departamento de Sanidad, interesaba purificar dichas aguas, se convertía en una obligación del Gobierno Insular y no del contratista, suplir un equipo para la cloración de las aguas. En este caso la obligación del contratista quedaba reducida exclusivamente a suministrar: "el mismo equipo usado para las pruebas de rendimiento de agua" y operarlo "durante un período de 24 a 48 horas, para que el Departamento de Sanidad tome las muestras de agua necesarias para ser analizadas, a los efectos de su aceptación."

Las inferencias más claras de toda la evidencia presentada, especialmente de la evidencia documental, son en el sentido, que la muestra de agua tomada durante la prueba preliminar de rendimiento resultó ligeramente contaminada. La carta del 18 de noviembre de 1942 del anterior Subcomisionado del Interior señor Frank Rullán dirigida al contratista señor José Rodríguez López no deja lugar a otra conclusión: "deseo informarle que habiendo este departamento hecho las gestiones ante el Dr. Oscar Costa Mandry, Jefe de los Servicios Médicos de la Defensa Civil, *para conseguir la cantidad de perchlorón necesaria para la prueba de dichos pozos*, se nos ofreció cooperación y la posibilidad de facilitar el referido material por recomendación de los ingenieros sanitarios Sres. Juan G. Figueroa y Gonzalo Diago, Jr., quienes nos ofrecieron también su cooperación. Tenga la bondad de pasar por las oficinas del ingeniero Sr. Molina, de este Departamento, quien le informará sobre los pasos que habrá de dar para conseguir dicho material. Esperamos que una vez conseguido esto, *quedará resuelto el asunto de la prueba de los pozos* y se continuará el contrato hasta su completa terminación:" (transcripción de la prueba documental página 64). Ya hemos visto cuál fué el resultado de toda esta gestión: en la Defensa Civil encontraron dos latitas, pero el propio químico de la Defensa Civil les advirtió que no usaran el perchlorón porque estaba inservible, que si lo usaban infectarían más el agua.

■ La prueba es clara asimismo en otro aspecto de la cuestión: que tanto el perchlorón como la gasolina eran materiales esenciales para la prueba de potabilidad ulterior del agua, y para la prueba final; que ambos materiales estaban racionados en virtud de una emergencia de guerra, que el perchlorón no se podía conseguir porque el barco que lo traía había sido hundido por el enemigo, que la gasolina tampoco se pudo conseguir porque las autoridades negaron el segundo permiso para tal uso. La parte apelada insiste que el contratista hubiera podido instalar un motor eléctrico y obviar la necesidad de la gasolina. Esto, sin embargo, hay que analizarlo conjuntamente con las otras circunstancias que concurren en la prueba: en primer lugar, la prueba preliminar de rendimiento del propio contrato establece, que "el contratista suministrará para la prueba de cada uno de los pozos, una bomba de pozo profundo adecuada *con su motor eléctrico o de gasolina* y todo el equipo e instrumentos *necesarios para determinar el rendimiento de cada pozo y los niveles del agua* mientras se bombea", o sea, el contrato dejaba a opción del contratista y no del gobierno, el uso de un motor movido por gasolina o de un motor movido por electricidad; en segundo lugar, de nada hubiera valido la instalación de la bomba con motor eléctrico si no se hubiera conseguido al mismo tiempo el material desinfectante para tratar la contaminación de las aguas; en tercer lugar, la obligación del contratista para el tratamiento de cloración, era suplir el mismo equipo instalado para la prueba preliminar de rendimiento; en cuarto lugar todos los esfuerzos del señor Alcalde, del anterior Departamento del Interior, del anterior Departamento de Sanidad y del propio contratista, fracasan en cuanto a los dos materiales concernidos, y no en cuanto a uno solo de ellos. De manera que la solución del problema no hubiera sido trocar una bomba movida por un motor de gasolina por una bomba movida por un motor eléctrico.

Otra de las posibles inferencias adversas al contratista apelante, es que el perchlorón no fuera en realidad necesario

para la cloración de las aguas, sino para la desinfección del sitio. No hay duda que tanto los ingenieros del anterior Departamento del Interior, como los ingenieros del anterior Departamento de Salud consideraron, y así lo establece claramente la carta del señor Rullán del 18 de noviembre de 1942, que el perchlorón era necesario para la prueba de dichos pozos.

Para esclarecer debidamente la cuestión litigiosa usaremos una metodología de exclusión. El aparente conflicto de la jurisprudencia tanto española como norteamericana, no podría resolverse en una síntesis adecuada, si no vamos excluyendo cuidadosamente las diversas proposiciones de hecho sobre las cuales opera dicho conflicto. Es indudable que en este caso no estamos frente a una acción por daños ocasionados al no haberse terminado la obra dentro de determinado plazo especificado o prorrogado, de acuerdo con el artículo 29 de las "Instrucciones para los Licitadores". Ni el anterior Departamento del Interior ni el Municipio de Carolina han tasado los daños ocasionados por el contratista a los efectos de continuar ellos la obra contratada. Por el contrario, después de la aprobación de la Ley número 40 de 1ro. de mayo de 1945 (pág. 139), estableciendo el Servicio de Acueductos y Alcantarillados de Puerto Rico, un nuevo plan gubernamental de alcance insular, ha dejado tal vez sin ninguna utilidad dichos pozos. Sólo así se explica que el Municipio de Carolina no hiciera uso de los muchos remedios que contiene un contrato de obra pública, para que el gobierno termine la obra por cuenta del contratista o de sus fiadores.

Es indudable que en este caso tampoco estamos frente a una situación de obra en parte no satisfactoria de acuerdo con el artículo 42 de "Instrucciones para los Licitadores". Ni el Departamento de lo Interior o el Municipio de Carolina han probado, que al examinar la obra se encontraron que una parte de ella no reunía los requisitos exigidos por

el contrato, ni trataron de ajustar el nuevo precio con el contratista. Por el contrario, la prueba demuestra que los ingenieros consultores del municipio consideraron la obra satisfactoria.

Es indudable asimismo que en este caso no estamos frente a una rescisión de acuerdo con los casos de rescisión establecidos en el mismo contrato, de acuerdo con las secciones 32 y 34 del "Pliego de Condiciones Generales para la contratación de las Obras Públicas Insulares." La prueba no demuestra que el contratista haya muerto y sus herederos o representantes legales no interesen continuar con el contrato, ni que el contratista faltare voluntariamente a las condiciones estipuladas en el contrato. Por el contrario, la prueba demuestra que hasta noviembre de 1942, por lo menos, tanto el gobierno como el contratista hacen todas las gestiones posibles dentro de la emergencia de guerra, para conseguir los materiales necesarios a las pruebas, y que hasta el momento mismo de producirse el racionamiento de materiales básicos, casi en un noventa por ciento del contrato, el contratista cumplió con su contrato. Por el contrario asimismo la obra se suspende por el Alcalde por un período de tiempo no especificado, pero sin lugar a dudas mayor de tres meses, a lo cual tenía derecho el gobierno de acuerdo con la sección 32 del "Pliego de Condiciones Generales para la contratación de Obras Públicas Insulares", pero no se procede a la recepción provisional de obras ni se le abona al contratista cantidad alguna, ni aparece que el anterior Comisionado del Interior estuviera conforme con la suspensión de la obra, que es lo que en realidad de derecho, daría base para rescisión de acuerdo con los propios términos del contrato.

Es indudable por demás que en este caso no estamos frente a una sustitución de parte ejecutante de acuerdo con el apartado 8 del contrato firmado por las partes. La prueba no demuestra que el Municipio de Carolina procedió a anular el contrato sujeto a las secciones 32, 33 y 34 del "Pliego de Condiciones Generales para la contratación de Obras

Públicas Insulares", en cuyo caso él contratista hubiera tenido derecho a un ochenta por ciento sobre "la obra ejecutada con arreglo a las condiciones del contrato." Por el contrario la prueba demuestra que el contratista terminó la obra antes del período de tiempo fijado, hasta el punto en que de acuerdo con las especificaciones técnicas, debía construir antes de proceder a las pruebas preliminares y suministró los materiales y la mano de obra necesarios en tiempo oportuno.

Es indudable que en este caso no estamos ante un contrato donde el contratista directamente y por escrito, asumiera el riesgo de cualesquiera circunstancias imprevisibles. Por el contrario, la sección 31 del "Pliego de Condiciones Generales para la contratación de Obras Públicas Insulares", admite reclamaciones por perjuicios causados al contratista en casos de fuerza mayor, y entre los casos de fuerza mayor enumerados expresamente en el pliego están: *"los destrozos causados a mano armada en tiempo de guerra por sediciones populares y robos tumultuosos."* Aunque la frase no es del todo clara y precisa, no hay duda que contempla tres situaciones distintas, (1) guerra, o sea, destrozo causado a mano armada por un enemigo exterior, (2) sedición, o sea, destrozo causado por revueltas populares de carácter revolucionario, y (3) robos tumultuosos, o sea, robos por facciones criminales o "partidas de alzados", tal como los contempla la jurisprudencia clásica española. Pero aún tomando la frase en su más estricto sentido literal, no sería muy difícil de interpretar que "destrozos causados a mano armada en tiempo de guerra", incluye hundimiento de barcos por acción submarina, que fué la que creó la falta de perchlorón en el mercado.

En cuanto al racionamiento de gasolina es conveniente recordar, que el contrato se celebró el 26 de febrero de 1942, y que no fué hasta el 20 de julio de 1942 que se inició el racionamiento de gasolina en Puerto Rico: Reglamento para

el Racionamiento de Gasolina en Puerto Rico, 7 F. R. 5607, Code of Federal Regulations of the United States of America. —Cumulative Supplement—Title 28-32 pág. 9399 (Edición del United States Government Printing Office (1944). Aunque la nación estaba dentro de un sistema de prioridades desde el 1940, nunca se creyó necesario racionar la gasolina. El racionamiento de gasolina en algunos estados de la Unión empezó el 12 de mayo de 1942, obra citada página 9399. Como cuestión de conocimiento público, durante la primera guerra mundial no hubo racionamiento de gasolina.

Habiéndose excluído del análisis del caso, los daños por la extensión del tiempo pactado para la terminación de la obra, la reclamación por obra en parte no satisfactoria, la rescisión contractual por incumplimiento voluntario del contratista, la sustitución de parte ejecutante, el riesgo asumido por circunstancias imprevisibles o fortuito, los hechos jurídicos nos imponen la obligación de aplicar en el presente caso la doctrina del *cumplimiento imposible*, o de la *imposibilidad en el cumplimiento*, no por menos conocida menos legítima, en la teoría general de las obligaciones.

El cumplimiento imposible se produce cuando examinadas las circunstancias en que se firma un contrato y las circunstancias en que debe cumplirse posteriormente, resulta que su cumplimiento posterior no es posible, por la sobreviniencia de ciertos hechos que no existían al momento de contraerse la obligación. En Inglaterra, desde los famosos "casos de la coronación", cuando sobrevenían cualesquiera circunstancias que no permitían el cumplimiento posterior de la obligación, ambas partes quedaban relevadas del cumplimiento posterior, pero ninguna de ellas podía exigir de la otra compensación de clase alguna, por aquella parte de la obligación que el obligado ya hubiera cumplido: "la pérdida yacía donde fallaba el cumplimiento", (*the loss lies where it falls*)—*Chandler* v. *Webster* 90 L.T.N.S. 217, (1904), 1 K.B. 493, *Blakeley* v. *Muller and Company* 88 L.T.N.S. 90, (1903) 2 K.B. 760. El principio de *Chandler* v. *Webster* estuvo en

vigor por muchos años pero la norma sentada no gozó de ningún favor dentro del espíritu crítico de su época. Por fin el 15 de junio de 1942, la Cámara de los Lores, actuando en sus funciones de tribunal de última instancia, falló el caso de *Fibrosa Spolka Akeyjna* v. *Fairbairn L. C. Barbour* 167 L.T.N.S. 101, 144 A.L.R. 1298, (1943), revocando el principio de *Chandler* v. *Webster* bajo la teoría, que si bien dentro del contrato no había base para el recobro de cualquiera cantidad pagada bajo un contrato de cumplimiento imposible, las circunstancias que habían motivado dicha imposibilidad, hacían surgir fuera del contrato, una relación cuasi contractual que permitía el recobro de cualquiera parte del contrato cumplida, cita precisa a la página 1305 del A.L.R.

En España, la revisibilidad del contrato por alteración de las circunstancias básicas dentro de las cuales se produce, ha ido ganando terreno en la jurisprudencia. De las implicaciones que sobre el tradicional axioma "pacta sunt servanda", norma fundamental del negocio jurídico, pueda tener la cláusula implícita en todo contrato denominada "rebus sic stantibus", (así firmes las cosas), o sea, la exigibilidad mientras las circunstancias básicas permanezcan como eran al producirse el contrato, hemos encontrado la siguiente glosa: "La eficacia del contrato que marca el precepto comentado . . . . suscita la cuestión del alcance que aquella pueda tener, bajo el principio tan fundamental y conocido de la *santidad de lo pactado*. Más frente a esa medida ilimitada que a la fuerza de lo convenido se le vino dando, cristalizan hoy ciertas orientaciones doctrinales *inspiradas precisamente en la buena fe* de que habla el artículo que consideramos y que responden al fin, al ensanchamiento de la moral en sus relaciones con el derecho . . . Una de estas limitaciones se concentra en la llamada cláusula que se supone implícita en todo contrato denominada *rebus sic stantibus* (así firmes las cosas) por la cual podía resolverse el contrato, *si sobrevenía un cambio importante en el estado de hecho existente al contratar* y en cuanto al resultado in-

justo y excesivamente oneroso que se originaba . . . Como desarrollo de la anterior idea, ha surgido también la base del negocio, según la cual, *la desaparición de las circunstancias que las partes se representaron y tuvieron en cuenta para consentir, es motivo de resolución del contrato.* Por último la teoría del riesgo imprevisible, permite que una de las partes pueda pedir la revisión o resolución *ante acontecimientos posteriores a la celebración del contrato que hubieren sido imprevisibles* y produzcan un notorio desequilibrio en las prestaciones. Un buen sector de la doctrina patria, opina en favor de incorporar a nuestro ordenamiento semejantes principios que tanto pueden contribuir a elevar el rango moral de la contratación": 8 Manresa, Volumen II página 326 et. seq. (Edición del Instituto Editorial Reus), (1950).

En Estados Unidos la teoría prevaleciente sobre cumplimiento imposible ha sido ordenada principalmente por Williston: 6 Williston *on Contracts* 5407 et seq. (Edición de Baker Voorhis & Co.), (1938). Para que el incumplimiento imposible pueda producirse los tribunales tienen que quedar satisfechos de los siguientes extremos: (1) que el obligado esté exento de culpa en el incumplimiento: (2) que una serie de circunstancias, ajenas a la voluntad del obligado, han sobrevenido para hacer el cumplimiento imposible; (3) que las cosas objeto del contrato no puedan ser restituídas en especie a la parte que sufragó su precio dentro de un tiempo razonable; y, (4) que el obligado no haya asumido directamente el riesgo de cualesquiera nuevas circunstancias que puedan impedir el incumplimiento. Aunque la regla contempla aquella imposibilidad en el cumplimiento que provenga de una acción de guerra o un acto de Dios, no está limitada ni restringida por la una ni por la otra. Como principio inspirado en la equidad y en un concepto de sana justicia, el cumplimiento imposible puede producirse aunque no se trate de una acción de guera o acto de Dios, siempre que concurran las circunstancias de la imposibilidad

total. El hecho que la propiedad se haya deteriorado o haya sido destruída, y la parte que debió recibir su beneficio no haya recibido beneficio alguno, no es defensa contra la reclamación que establezca el que prestó sus servicios, acopió los materiales o satisfizo la mano de obra necesaria para construirla. La impracticabilidad en el cumplimiento se reconoce como una modalidad del cumplimiento imposible. 6 Williston *on Contracts*, supra, citas precisas a las páginas 5421, 5419, 5539, 5420, 5551; vide además *"Restatement of the Law of Contracts"*, sección 468, página 884, (Edición del *American Law Institute Publishers)*, (1932); *Von Waldheim* v. *Englewood Heights Estates* 179 Atl. 19, (Brogan) (1935), cita precisa a las páginas 21 y 22; *Cochrane* v. *Forbes*, 153 N.E. 566, (Sanderson), (1926), cita precisa a la página 569.

El efecto jurídico de la imposibilidad en el cumplimiento, si sobreviene después de firmado y ejecutado parcialmente el contrato, es que las partes quedan relevadas de todo cumplimiento posterior, y están obligadas mutuamente a restituirse el valor de las prestaciones que hasta la fecha de la imposibilidad hubieren recibido. *Tulsa Opera House Co.* v. *Mitchell*, 24 P.2d 997, (Osborn), (1933), cita precisa a la página 1001, mediante la imposición de una nueva relación jurídica de carácter cuasi contractual, *Blockdel Realty Co. Inc.* v. *Doyle* 6 A.2d 670, (Lewis), (1939), cita precisa a la página 671; *Von Waldheim* v. *Englewood Heights Estates*, 179 Atl. 19, (Brogan), (1935), cita precisa final de página 21 y vuelta de página 22; pudiendo utilizarse para hacer valedera la nueva relación cuasi contractual la acción de *assumpsit: Butterfield* v. *Byron*, 27 N.E. 667, (Knowlton), (1891); *Angus et al.* v. *Scully*, 57 N.E. 674, (Hammond), (1900); *Young* v. *City of Chicopee*, 72 N.E. 63, (Hammond), (1904).

Después del estudio de la glosa más confiable dentro de una institución de derecho aún en pleno desarrollo, y procurando que la puridad de los conceptos no derrote la propo-

sición de justicia sustancial que inspira la nueva doctrina, adoptamos como regla local la siguiente: en obligaciones recíprocas, donde ha habido un cumplimiento parcial de la obligación, cuando sin culpa del obligado sobrevienen una serie de circunstancias que hagan imposible el cumplimiento total de la obligación, el obligado queda relevado de cumplir con aquella parte del contrato cuyo cumplimiento se ha hecho imposible, y a menos que el obligado haya asumido expresamente el riesgo de circunstancias imprevisibles, de las cuales hubiera podido tener plena conciencia al momento de firmar el contrato, tiene derecho a recobrar cualesquiera servicios prestados, acopio de materiales y mano de obra hasta el momento mismo en que se produzca la imposibilidad para el cumplimiento final de la obligación; aunque la acción de guerra y el acto de Dios quedan comprendidos dentro [de] la imposibilidad en el cumplimiento no excluyen otras circunstancias que creen una excesiva onerosidad para el obligado.

En cuanto al montante del recobro, los tribunales han establecido la norma que dicho recobro debe siempre concederse evitando cualquier lucro o especulación de una parte con la otra (*lucratus*), concediéndose solamente el valor intrínseco de las cosas (*quantum meruit*), si de los términos del contrato no se desprende otra medida de compensación, y en todo caso reduciendo del precio aquella parte del contrato que no haya podido ser cumplida: *Blockdel Realty Co., Inc.* v. *Doyle,* 6 A.2d 670, (Lewis), (1939); *Poche* v. *Landry,* 57 So.2d 808, (McBride), (1952).

La teoría es igual aunque se trate de contratos entre un gobierno y una persona particular. Cuando un gobierno contrata con una persona particular, el contrato hay que interpretarlo como si se tratara de un contrato entre dos personas particulares: *United States* v. *Smoot,* 15 Wall 36, 21 L. ed. 107, (Miller), (1873), *The Amoskeag Manufacturing Company* v. *United States,* 17 Wall 592, 21 L. ed. 715 (Miller), (1873), *Reading Steel Casting Co.* v. *United States,* 268 U.S. 186, 69 L. ed. 907, (Butler), (1925).

█ Aplicando la teoría de la imposibilidad del cumplimiento a este caso, llegamos a la conclusión, que habiendo demostrado la prueba, (1) que el obligado está exento de culpa en el cumplimiento, (2) que la escasez del perchlorón y el racionamiento de la gasolina impuestos por una situación de guerra son circunstancias que no existían al momento de firmarse el contrato, y que cuando sobrevienen hacen imposible el cumplimiento por ambas partes en cuanto a las pruebas del agua, (3) que las cosas objeto del contrato no pueden restituirse en especie y (4) que el obligado no asumió expresamente y por escrito el riesgo de circunstancias imprevisibles y considerando además, (5) que el día 5 de julio de 1942 se autorizó por el señor Alcalde de Carolina don Juan Osorio la paralización de la obra hasta nueva orden, —transcripción de prueba documental páginas 20 y 21—, de acuerdo con las facultades que le confiere la sección 34 del "Pliego de Condiciones Generales para la contratación de Obras Públicas Insulares," no habiéndose ordenado la continuación de la obra después de dicha fecha, es indudable que tiene derecho a recobrar por sus servicios profesionales, por los materiales acopiados y la mano de obra contratada para dicha construcción, hasta el momento mismo en que el cumplimiento se hizo imposible.

En cuanto al montante a concederse, el contrato firmado entre las partes no nos ofrece un método de computación satisfactorio. La divisibilidad del precio empieza casualmente después de concluirse la prueba preliminar. Pero el contrato sirve para indicarnos que parte de la obligación quedó sin cumplir. Después de la instalación del equipo para la prueba preliminar de rendimiento y toma de muestras de agua, la obligación del contratista quedaba reducida a construir "la pared de grava y el sello de hormigón indicados en el plano, en caso que el pozo fuere de este tipo." Una vez terminada la prueba final, "el contratista proporcionará y colocará una tapa apropiada, según se demuestra en el plano, en cada uno de los pozos aceptados por el Departa-

mento del Interior y procederá a la limpieza y acondicionamiento general del sitio o sitios donde hayan sido construídos dichos pozos . . . removiendo desperdicios, etc., de acuerdo con indicaciones del Ingeniero a cargo de las obras y a entera satisfacción de éste", ("Condiciones Facultativas", página 4). La imposibilidad del cumplimiento final se produce durante la prueba preliminar, cuando la escasez del perchlorón no permite el tratamiento de desinfección del agua ligeramente contaminada. Teniendo en cuenta la norma establecida de evitar cualquier lucro debido al incumplimiento parcial, creemos que una compensación del setenta y cinco por ciento del precio total del contrato compensa debidamente al contratista en el presente caso.

*Debe revocarse la sentencia dictada, y dictarse otra, condenando al Municipio de Carolina a pagarle al contratista señor José Rodríguez López la cantidad de seis mil dólares, por todo el valor de sus servicios, los materiales acopiados y la mano de obra contratada para llevar a cabo dicha construcción, sin costas ni honorarios de abogado.*