Cordero, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nuestra consideración Caribbean Petroleum Corporation (“Capeco”) mediante el recurso de apelación Núm. KLAN-98-00204 y solicita que revoquemos la Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, el 14 de enero de 1998. En dicha Sentencia, cuyo archivo en autos y notificación se efectuó el 22 de enero de 1998, el Tribunal de Primera Instancia declaró Sin Lugar todas las reclamaciones contenidas en una demanda por incumplimiento de contrato y daños y perjuicios que presentara Capeco contra Tomás Vélez Torres (“Vélez”). Capeco también acude ante nuestra consideración mediante recurso de Núm. KLCE-98-00355 y solicita que revisemos la determinación emitida por el Tribunal de Primera Instancia en la cual declaró Con Lugar un memorando de costas presentado por Vélez en el caso de epígrafe.
I
Vélez es propietario de una estación de servicio y venta dé combustible ubicada en el pueblo de Bayamón. En enero de 1985, Gulf Petroleum, S.A. (“Gulf”) y Vélez otorgaron una serie de contratos mediante los cuales Gulf se obligó a suministrarle combustible, grasa y aceite, realizar varias mejoras físicas en la estación de servicio y prestar, en calidad de comodato, aquellos equipos necesarios para la operación del negocio.'El contrato de suministro de combustible tenía un término de cinco (5) años si cualquiera de las partes daba notificación a la otra sobre la terminación del mismo, noventa (90) días antes de expirarse. Si dicha notificación no se realizaba, el convenio se entendería prorrogado por un término adicional de cinco (5) años. Conforme a los términos del contrato de suministro, Vélez se obligó a comprarle a Gulf un mínimo de 3,900,000 galones de gasolina con y sin plomo dentro del plazo de cinco (5) años pactado al precio establecido por las agencias gubernamentales concernientes. Si al finalizar el quinto año Vélez no había comprado dicha suma, el contrato quedaría extendido a opción exclusiva de la Gulf, hasta que Vélez cumpliera con la cantidad mínima acordada. También las partes suscribieron un contrato de suministro de aceites y grasa a cinco (5) años bajo condiciones similares al de suministro de combustible. La única diferencia entre uno y otro contrato consistía en que bajo el convenio de suministro de aceite y grasa, la obligación de Vélez era comprarle a Gulf cincuenta y cinco (55) galones de estos productos en cinco (5) años. Surge del expediente ante nos que Gulf se reservó la primera opción para la compra, arrendamiento, financiamiento y/o cualquier otra transacción que pudiera realizarse con la estación de servicio. Esta primera opción caducaría al cabo de cinco (5) años a partir de enero de 1985.
Mediante el contrato de comodato, Vélez tenía derecho a usar en calidad de préstamo, unos compresores *1108 de aire, torres de bombas de aire, agua y gasolina, pinos de engrase y lavado de automóviles, tanques para almacenar combustible, entre otro equipo que pertenecía a Gulf. Este contrato tendría un término de diez (10) años. Si las operaciones de la venta de combustible en la estación ofrecida por Gulf terminaba antes de que se extinguiera el contrato de comodato, Vélez estaba obligado a reembolsar a Gulf por toda la inversión no amortizada. El cómputo de la amortización de cualquier inversión en equipo hecha por Gulf en la estación de Vélez se determinaría a base de una vida útil de diez (10) años, a partir de su instalación y se amortizará en diez (10) plazos anuales iguales. El valor para propósitos de amortización de equipo instalado por Gulf en la estación de servicio de Vélez era de $41,382.
Cabe señalar que las cláusulas de galonaje contenida en el contrato de suministro de gasolina fueron establecidas por Gulf de manera unilateral, cuando históricamente la realidad era que la estación de Vélez sólo vendía 40,000 galones de combustible mensuales. Igual ocurrió con el contrato de distribución de aceites y grasa. Vélez nunca pudo alcanzar las cifras mínimas de compra establecidas en los contratos antes mencionados. Sin embargo, durante los cinco (5) años que duró el contrato no se le exigió el cumplimiento de dicha cláusula y, por el contrario, a Vélez se le otorgaron varios reconocimientos como vendedor ejemplar de la empresa. Durante el año 1987, Capeco se convierte en la sucesora en derechos de Gulf. Esto también contribuyó a que Vélez no pudiera alcanzar las metas de compra, ya que Capeco eliminó el sistema de tarjetas de crédito y recortó recursos destinados a promover sus productos. A esto se le debe añadir que en 1988 se eliminó del mercado la gasolina con plomo.
En abril de 1989, ocho (8) o nueve (9) meses antes de cumplirse el término de cinco (5) años fijado en los contratos de distribución suscritos por Gulf y Vélez, este último informó a los funcionarios de Capeco que no estaba interesado en renovar los contratos suscritos en 1985. Como regla general, antes de negociar un nuevo contrato, Capeco realizaba un estudio de viabilidad sobre el potencial de ventas de la estación. Luego se visitaba al detallista y se determinaban sus necesidades. A base de esa investigación, se redactaba un documento con el cual se iniciaban las negociaciones. Posteriormente, ese documento era aprobado por la alta gerencia de la compañía y se hacía una propuesta al detallista. Así las cosas, comenzaron las negociaciones entre Capeco y Vélez. El 13 de octubre de 1989, Capeco presentó a Vélez una carta propuesta que éste rechazó. Esta propuesta consistía en la otorgación de dos (2) nuevos contratos. En el primero, Capeco arrendaría la estación a Vélez, quien a su vez subarrendaría la estación a Capeco. En el segundo, Capeco prestaría a Vélez cierta cantidad de dinero para realizar mejoras a la estación de servicio y se constituiría una hipoteca voluntaria sobre la propiedad para asegurar la inversión que Capeco realizaría. Las partes continuaron negociando y con fecha 30 de enero de 1990, Capeco presentó a Vélez una nueva carta propuesta, la cual fue firmada por éste. Dicha carta propuesta contenía una cláusula que limitaba su vigencia por quince (15) días y sujetaba la aceptación de la misma a que la alta gerencia de Capeco aprobara su contenido. El 4 de febrero de 1990, la Junta de Directores de Capeco impartió su aprobación al acuerdo preliminar. Esta aprobación nunca le fue notificada a Vélez. El 17 de abril de 1990, Vélez remitió por escrito a Capeco su decisión de dar por terminada las relaciones entre ambos. Además, Vélez le solicitó a Capeco coordinar una fecha para la remoción del equipo objeto del contrato de comodato. Aún así, del expediente ante nuestra consideración surge que oficiales de Capeco le cursaron una nueva oferta a Vélez, que también rechazó. Posteriormente, los tanques y el equipo perteneciente a Capeco fueron substraídos de la estación de servicio de Vélez, pero ésta le hizo claro que con ello no renunciaba a sus derechos. Posteriormente, Vélez entró en una nueva relación contractual con Gasolinas de Puerto Rico, Inc. (“Gasolinas”).
Así las cosas, en enero de 1991, Capeco presentó demanda contra Vélez por incumplimiento de contrato y daños y perjuicios y contra Gasolinas por interferencia torticera con una relación contractual. Luego de varios trámites procesales y una vez celebrado juicio en su fondo, el Tribunal de Primera Instancia emitió Sentencia declarando No Ha Lugar todas las causas de acción presentadas por Capeco y le impuso el pago de costas. 
*1109 Inconforme con esta determinación, Capeco acude ante nos mediante apelación y plantea que el Tribunal de Primera Instancia erró al apreciar la prueba que tuvo ante sí y concluir: (1) que las relaciones contractuales entre las partes no se prorrogaron en virtud de que Vélez no cumplió con la cláusula que lo obligaba a comprar un mínimo de galones de los productos distribuidos por Gulf; y (2) que al ambas partes suscribir la carta propuesta del 30 de enero de 1990, se perfeccionó un contrato que file incumplido por Vélez.
Oportunamente, Vélez presentó un memorando de costas, el cual fue impugnado por Capeco. Sin embargo, el 12 de marzo de 1998, el Tribunal de Primera Instancia aprobó dicho memorando. De esta determinación, cuyo archivo en autos y notificación se efectuó el 13 de marzo de 1998, Capeco recurre ante este Foro mediante recurso de certiorari e imputa al Tribunal de Primera Instancia haber abusado de su discreción.
II
En cuanto al primer señalamiento de error hecho por Capeco, las relaciones contractuales entre ambas partes no quedaron prorrogadas, ya que la cláusula que obligaba a Vélez a comprar a Capeco un mínimo de productos antes de finalizar los contratos de distribución suscritos por ambas partes, era imposible de cumplir.
El Artículo 1224 del Código Civil de Puerto Rico, 31 L.P.R.A, sec. 3422, establece que “ [n]o podrán ser objeto de contrato las cosas o servicios imposibles”. De forma similar, el Artículo 1138 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3193, expresa que “[tjambién quedará liberado el deudor en las obligaciones de hacer cuando la prestación resultare ser legal o físicamente imposible”. Al discutir estas disposiciones, el tratadista español Puig Brutau distingue entre la imposibilidad originaria o inicial de la prestación exigida por la obligación y la imposibilidad posterior o sobrevenida. La inicial (a la que hace referencia el Artículo 1224, supra), no es causa de la extinción de la obligación, sino que es una circunstancia que impide su nacimiento. II Puig Brutau, Compendio de Derecho Civil, pág. 109 (1994). La posibilidad inicial de la prestación constituye un presupuesto de validez de la obligación en razón a que nadie puede quedar obligado a realizar algo que es imposible (ad impossibilia nemo tenetur). II Diez Picazo, Fundamentos de Derecho Civil Patrimonial, pág. 289 (1996).
Por el contrario, cuando la imposibilidad es posterior o sobrevenida (a lo que hace referencia el Artículo 1138 del Código Civil, supra) y la prestación se ha convertido en imposible sin culpa del deudor, no puede serle exigida y necesariamente ha de quedar libre de la obligación. Puig Brutau, supra, pág. 109. El Tribunal Supremo de Puerto Rico ha expresado que el cumplimiento imposible posterior de una obligación se produce cuando examinadas las circunstancias en que se firma un contrato y las circunstancias en que luego debe cumplirse, resulta que su cumplimiento posterior no es posible por la sobreviniencia de ciertos hechos que no existían al momento de contraerse la obligación. Rodríguez v. Municipio, 75 D.P.R. 479, 490 (1975). Para determinar si la imposibilidad sobrevenida de una prestación produce la extinción de la obligación, debe tomarse en consideración: (1) que el obligado esté exento de culpa del incumplimiento; (2) que una serie de circunstancias, ajenas al obligado, han sobrevenido para hacer el cumplimiento imposible; (3) que las cosas objeto del contrato no puedan ser restituidas, en especial a la parte que sufragó su precio dentro de un tiempo razonable; y (4) que el obligado no haya asumido directamente el riesgo de cualesquiera nuevas circunstancias que puedan impedir el cumplimiento. Id. pág. 492.
En cualquiera de las dos (2) circunstancias, la existencia de una imposibilidad puede derivarse de un obstáculo natural, físico, de hecho, en cuyo caso se habla de imposibilidad natural. También la pugna puede producirse por la presencia de una dificultad insalvable de carácter legal o jurídico diciéndose, en este supuesto, que hay imposibilidad jurídica. IX Seix, Nueva Enciclopedia Jurídica, pág. 454 (1979).
Ahora bien, en el caso de autos, la prueba que desfiló ante el Tribunal de Primera Instancia demostró que *1110 Gulf, de manera unilateral, fijó el mínimo de galonaje que debía comprar Vélez. También quedó demostrado que históricamente la estación de servicio en controversia nunca pudo lograr alcanzar las cifras de compra de galonaje que Gulf establecía. En vista de que las relaciones contractuales entre Gulf y Vélez comenzaron desde 1968, es obligatorio concluir que la primera conocía, antes de firmar los contratos de suministro en 1985, que la estación de Vélez no podría alcanzar las marcas de compra mínimas. Al así actuar, Capeco violó los más elementales preceptos de la buena fe en un intento de atar a Vélez por un término que excede lo razonable. Debe recordarse que si bien es cierto que en Puerto Rico rige el principio de la libertad de contratación, Unisys Puerto Rico Inc. v. Ramallo Brothers Printing, 128 D.P.R. 842, 850 (1991), es ilegítimo el ejercicio de ese derecho cuando el titular excede manifiestamente los límites impuestos por la buena fe o por el fin social o económico de ese derecho. Velilla v. Pueblo Supermarkets, Inc., 111 D.P.R. 585, 588 (1981). Por lo tanto, concluimos que la cláusula de galonaje en controversia es nula por ser imposible de cumplirse con las cuotas impuestas.
De todas formas, aun cuando la cláusula de galonaje no fuera nula, sería inexigible, por cuanto su cumplimiento advino imposible con posterioridad a la firma de los contratos en 1985. El cambio de Gulf a Capeco, la eliminación de la gasolina sin plomo en 1988 y del sistema de pago con tarjeta de crédito y los recortes en gastos de promoción que efectuó Capeco, afectaron adversamente las ventas de la estación de servicio de Vélez. En cuanto al mínimo de combustible, se supone que Vélez comprara a su distribuidor 3,900,000 galones en un período de cinco (5) años. Históricamente, Vélez vendía mensualmente 40,000 galones de combustible. En un plazo de cinco (5) años, esto equivaldría a 2,400,000 galones. Esto se traduce en una diferencia de 1,500,000 que debería vender en un tiempo aproximado de cinco (5) años por encima de lo originalmente pactado, lo cual resulta en extremo irrazonable y contrario a la buena fe que debe regir el cumplimiento de una relación contractual. Del expediente ante nuestra consideración no surge que Vélez tenga culpa por el incumplimiento de contrato que le es imputado. Tampoco surge del mismo que Vélez asumió directamente el riego por el cambio en las circunstancias. Resulta, entonces, que la obligación en controversia se hizo imposible de realizar y Vélez quedó relevado de su cumplimiento. Al quedar relevado de cumplir con dicha cláusula, haber dado notificación oportuna a Capeco de que no interesaba continuar bajo los términos de la antigua relación contractual y expirar el término de cinco (5) años establecido para que Capeco ejerciera su primera opción, así como el término de vigencia de los contratos de suministro, Vélez quedó en libertad para iniciar una nueva relación contractual con Capeco o cualquier otra empresa.
III
En segundo lugar, debemos resolver si, como plantea Capeco, en efecto el 30 de enero de 1990 se perfeccionó un contrato entre ésta y Vélez.
Resulta en extremo pertinente al caso de autos lo resuelto por el Tribunal Supremo de Puerto Rico en Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517, 522-523 (1982). Veamos:
Ciertamente, la aceptación de la oferta es el procedimiento normal para el perfeccionamiento del contrato. En esa forma se manifiesta el consentimiento de las partes que, como sabemos, es requisito esencial para la existencia del contrato. Así lo establece el Art. 1214 del Código Civil cuando dispone que: “El consentimiento se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y la causa que han de constituir el contrato.” 31 L.P.R.A. sec. 3401.
Es decir, el vínculo obligacional entre las partes surge del acuerdo de voluntades que se manifiesta con la oferta y la aceptación. Pero para que ello sea así, es indispensable que la oferta reúna determinados requisitos entre los cuales se destaca, por su importancia en el caso de autos, el que la declaración de voluntad del oferente sea completa; que contenga todos los elementos esenciales del contrato que se estimen necesarios, de *1111 manera que quede el contrato perfeccionado con la mera aceptación de la oferta. L. Diez-Picazo, Fundamentos del Derecho Civil Patrimonial, Madrid, Ed. Tecnos, 1979, Vol. I, pág. 193; J. Puig Brutau, Fundamentos de Derecho Civil, 2da. ed., Barcelona, Ed. Bosch, 1978, T. II, Vol. I, pág. 180, n. 14; J. L. Lacruz Berdejo, Elementos de Derecho Civil, Barcelona, Ed. Bosch, 1977, T. II, Vol. 2, págs. 74-75; J. Castán Tobeñas, Derecho Civil Español, Común y Foral, lima ed., Madrid, Ed. Reus, 1974, T. III, pág. 533; E. Vázquez Bote, Derecho Civil en Puerto Rico, Barcelona, Ediciones Jurídicas, 1973, T. III, Vol. 1, págs. 481-482. Puig Brutau subraya que “[s]ólo es verdadera oferta la que puede generar el contrato con la simple aceptación”. Op. cit., pág. 180, n. 14. En el mismo tenor se pronuncia Moreno Quesada:
“[O]tro requisito para la existencia de verdadera oferta es que en ella se contengan los elementos esenciales del negocio que se trata de realizar,... de tal modo que por la aceptación, es decir, por la mera adhesión de la persona a la que va dirigida, pueda surgir el contrato; y esto es porque, siendo la oferta con la aceptación, lo fundamental del contrato, si con su concurrencia no fuera suficiente para su formación y hubiera que recurrir a un nuevo acuerdo, el valor de la primitiva propuesta no sería el de verdadera oferta, sino el de trato preliminar encaminado a la formulación de la misma. Así, tendremos oferta cuando en ella se contengan los elementos esenciales para la formación del contrato, de tal modo que no sea necesario para saber su contenido un nuevo acuerdo de las partes cuando se haya producido la aceptación.” B. Moreno Quesada, La Oferta de Contrato, Barcelona, Colección Nereo, 1963, págs. 64-65.
La norma imperante en el Derecho norteamericano coincide plenamente con la doctrina española a este respecto. W.H.E. Jaeger, Willinston on Contracts, 3ra ed., Mount Kisco, New York, Baker, Voorhis & Co., Inc., 1957, Vol. I, Sec. 37, pág. 108; A. Corbin, Corbin on Contracts, St. Paul, Minnesota, West Publishing Co., 1963, Vol. I, Sec. 11, pág. 26.
Sabido es que nadie está obligado a contratar. Este principio basilar del derecho de obligaciones tiene como consecuencia que las partes no están obligadas a proseguir con las negociaciones hasta perfeccionar el contrato, sino que están en libertad de contraer el vínculo o de retirarse, según convenga a sus mejores intereses. Prods. Tommy Muñiz v. COPAN, supra, a la pág. 526. En el caso de autos, surge claramente de copia de la carta propuesta del 30 de enero de 1990, que la misma estaba condicionada a que la alta gerencia de Capeco diera su aprobación a la misma. Esta condición no permitió que la oferta allí contenida fuera una completa, pues quedaba sujeta a objeciones y nuevas enmiendas de parte del oferente, que en este caso era Capeco. Por lo tanto, se trata de una propuesta preliminar de que Vélez tenía la facultad de aceptar o no en un período de quince (15) días y que estaba encaminada a que se le formulara, posteriormente, una oferta completa. La simple aceptación que Vélez dio a dicha propuesta no fue suficiente para configurar un contrato, ya que no se puede quedar obligado sin conocer si la otra parte contratante dio su consentimiento a lo ofrecido. Esta conclusión se fortalece aún más, ya que según surge de la transcripción de la prueba que obra en autos, dicha aceptación nunca le fue notificada a Vélez. Además, con posterioridad a que Vélez refrendara con su firma la carta propuesta del 30 de enero de 1990, Capeco realizó un nuevo ofrecimiento, el cual fue también rechazado por Vélez. Por lo tanto, nunca se perfeccionó un nuevo contrato entre Vélez y Capeco, así como tampoco se puede hablar de que Gasolinas haya interferido torticeramente con un contrato que nunca se perfeccionó.
IV
Ahora bien, en el presente caso, el Tribunal de Primera Instancia incidió al desestimar la causa de acción que presentara Capeco en virtud del contrato de comodato. 
Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarios a las leyes, a la moral, ni al orden público. Artículo 1207 del Código Civil, 31 *1112 L.P.R.A. sec. 3372. Es principio reiterado que “[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. ” Artículo 1233 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3471; III J. Castán Tobeñas, Derecho Civil Español, Común y Foral, 691-692 (1992). Específicamente, de la copia de dicho contrato que obra en el expediente ante nos, surge una cláusula que claramente obliga a Vélez a indemnizar a Capeco como sucesora de Gulf, si dentro del término de su vigencia que alcanzaba los diez (10) años, cesaban las operaciones de ventas de combustible ofrecido por Gulf en la estación de servicio. En vista de que Vélez y Capeco nunca pudieron llegar a un acuerdo sobre la continuación de sus relaciones contractuales y que como cuestión de hecho Vélez comenzó una nueva relación contractual con Gasolinas, cinco (5) años antes de que expirara el contrato de comodato, surge la obligación de éste de indemnizar a Capeco por la inversión no depreciada hecha en el equipo objeto del contrato de comodato. Esta indemnización deberá ser computada de acuerdo a los términos a los que se obligaron las partes dentro del mencionado contrato.
V
Finalmente, debemos resolver la procedencia de la imposición de costas a favor de Vélez.
La Regla 44.1 (a) de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone, en cuanto a costas, lo siguiente:

“Las costas le serán concedidas a la parte a cuyo favor se resuelva el pleito o se dicte sentencia en apelación, excepto en aquellos casos en que se dispusiera lo contrario por ley o por estas reglas. Las costas que podrá conceder el tribunal son los gastos incurridos necesariamente en la tramitación de un pleito o procedimiento que la ley ordena o que el tribunal, en su discreción, estima que un litigante debe reembolsar a otro. ”

Dicha disposición tiene dos funciones: (1) resarcir a la parte victoriosa, a manera de reparación, por los gastos necesarios y razonables en que incurrió durante el litigio; y (2) disuadir la presentación de pleitos temerarios y superfluos. J.T.P. Dev. Corp. v. Majestic Realty Corp., 130 D.P.R. 456, 460 (1992); Rodríguez Cancel v. A.E.E., 116 D.P.R. 443, 461 (1985; Garriga, Jr. v. Tribunal Superior, 88 D.P.R. 245, 253 (1963).
En nuestra jurisdicción, la imposición de costas a favor de la parte vencedora es mandatoria. J.T.P. Dev. Corp. v. Majestic Realty Corp., supra, a las págs. 460-461; Vélez v. Bayrón Vélez, 114 D.P.R. 833, 839 (1983). Ahora bien, al imponer costas, el tribunal habrá de determinar cuál, si alguna, fue la parte a cuyo favor se resolvió el pleito, es decir, quien fue el litigante vencedor. J.T.P. Dev. Corp. v. Majestic Realty Corp., supra, a la pág. 461. Lo anterior toma especial relevancia cuando se acumula más de una reclamación, ya que la tarea de identificar quién es la parte victoriosa, a los fines de conceder costas, se dificulta. Id. Surge la posibilidad de que cada parte en el pleito salga victoriosa en una o algunas de las reclamaciones. Id.
Al discutir la Regla 54 (d) de Procedimiento Civil Federal, 28 U.S.C.A. F.R.Civ.P., Rule 54 (d), similar a nuestra Regla 44.1, supra, se ha dicho que cuando tanto la parte demandante como la demandada prevalecen, el tribunal puede denegar las costas a ambas partes. Id., citando a Allen & O’Hara, Inc. v. Barrett Wrecking, Inc., 898 F. 2d 512 (7mo Cir. 1990); 3 Moore's Manual, Federal Practice and Procedure, Sec., 25.06L21 (Supp. 1995). Por otro lado, cuando un demandante ha presentado múltiples reclamos y resultó victorioso en tan sólo uno, los tribunales le han concedido las costas al demandado. 4 Kooman, Federal Civil Practice, Sec. 54.15 (1975). Otras veces, los tribunales han prorrateado las costas entre las partes que han obtenido remedio, aunque no en su totalidad. 10 Wright, Miller and Kane, Federal Practice and Procedure, Sec. 2GG7 (1983). En fin, los tribunales en los Estados Unidos no han sido uniformes al conceder costas cuando hay varias reclamaciones implicadas en el pleito. Y es que, “[tjhere has been many cases written on the allowance of cost and most of them peculiar to their own circumstance”. J.T.P. Dev. Corp. v. Majestic Realty Corp., supra, a la pág. 462, *1113 citando a S.A. Hirsh Manufacturing Company v. Childs, 157 F. Supp. 183, 184 (W.D. Penn. 1957).
En el caso de autos, Capeco alegó que Vélez había incumplido varias relaciones contractuales existentes entre sí. Por esta razón, Capeco presentó demanda solicitando indemnización en daños y perjuicios por cada uno de los contratos incumplidos. Se trata, pues, de una demanda que contiene varias reclamaciones y que fue desestimada en su totalidad por el Tribunal de Primera Instancia, con imposición de costas a favor de Vélez. Este último, de manera oportuna, presentó el correspondiente memorando y reclamó $20.00 por concepto de sellos de presentación y $8,391.75 de honorarios de su perito, Sr. Reynaldo Quiñones. En vista de que el Tribunal de Primera Instancia incidió al desestimar la reclamación de Capeco al amparo del contrato de comodato suscrito entre ésta y Vélez, dejamos sin efecto la imposición de costas a favor del último. En su lugar, luego de examinar la totalidad de las circunstancias del caso ante nos y en el ejercicio de nuestra discreción, concluimos que cada parte deberá asumir los gastos que haya incurrido en la litigación del presente pleito.
VI
Por los fundamentos antes expuestos, procedemos a MODIFICAR la Sentencia objeto del recurso Núm. KLAN-98-00204 y devolver el caso al Tribunal de Primera Instancia para que, consistente con esta Sentencia, celebre vista en la cual se ventile el monto de la indemnización a la que tiene derecho Capeco bajo el contrato de comodato y emita una nueva Sentencia, conforme a lo expresado por este Tribunal. En cuanto al recurso Núm. KLCE-98-00355, procedemos a EXPEDIR el auto solicitado y REVOCAR la Resolución recurrida.
Lo acuerda y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2000 DTA 79
1. En cuanto a la reclamación por interferencia contractual contra Gasolinas, el Tribunal de Primera Instancia desestimó la misma, toda vez que al concluir que no existía un contrato entre Gulf o Capeco y Vélez, este último estaba en libertad de entrar en una relación contractual con quien quisiera. De esa decisión no se apeló.
2. Además, nos resulta extraño que un tribunal, al decidir un caso a favor de una parte, llegue a conclusiones que parten sobre la base de que se está cometiendo un error al emitir la Sentencia.