Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| LEDESMA & VARGAS, LLC<br><br>Apelante<br><br>v<br><br>PLAZAQ, LLC<br><br>Apelado | TA2026AP00117 | APELACIÓN procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Civil núm.: SJ2020CV02898 (902)<br><br>Sobre: Sentencia Declaratoria; Consignación |

Panel integrado por su presidente el juez Hernández Sánchez, el juez Rivera Torres y el juez Marrero Guerrero.

**Rivera Torres, Juez Ponente**

**SENTENCIA**

En San Juan, Puerto Rico, a 24 de marzo de 2026.

Comparece ante este tribunal apelativo, Ledesma & Vargas, LLC (LV o apelante) mediante el recurso de *apelación* de epígrafe solicitándonos que revisemos la *Sentencia Parcial* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI), el 20 de noviembre de 2025, notificada el mismo día. Mediante este dictamen, el foro primario declaró *Ha Lugar* a la *Solicitud de Sentencia Sumaria Parcial* presentada por PlazaQ, LLC. (PlazaQ o apelado). En consecuencia, desestimó, con perjuicio, la demanda instada por LV.

Por los fundamentos que expondremos a continuación, confirmamos el dictamen apelado.

**I.**

El caso de autos tiene su origen en una demanda instada, el 22 de mayo de 2020, por LV contra PlazaQ sobre sentencia

declaratoria y consignación.[1] Se alegó que LV y PlazaQ otorgaron un contrato de arrendamiento para el alquiler de un espacio de oficinas y estacionamientos desde el 2012. No obstante, y en lo que nos concierne, a raíz del estado de emergencia a causa del COVID-19 y las Órdenes Ejecutivas números OE-2020-023, OE-2020-029 y OE-2020-033 (Órdenes Ejecutivas) emitidas por el Gobierno, adujo que estuvo imposibilitado de operar el establecimiento arrendado desde el 15 de marzo de 2020.

Posteriormente, y ante nuevas órdenes ejecutivas que permitieron que ciertos establecimientos y sectores (entre estos, los servicios legales) reanudaran sus operaciones, LV arguyó que el 7 de mayo de 2020 completó un plan de manejo de riesgo de contagio y sometió una auto certificación al Departamento del Trabajo y Recursos Humanos. Por tanto, reanudó parcialmente sus operaciones y reabrió sus oficinas.

Agregó que, aunque siempre ha cumplido con su obligación del pago de los cánones de arrendamiento, el 15 de mayo de 2020 cursó una misiva al apelado ofreciéndole pagarle la renta, correspondiente a los meses de abril y mayo, aplicándole un veinte por ciento (20%) de descuento.[2] Por ello, adjuntó el cheque núm. 7172 por $33,694.93. En la carta advirtió que la aceptación del cheque constituía la aceptación del descuento. Sin embargo, señaló que ese mismo día PlazaQ rechazó el cheque y solicitó el pago íntegro de las cantidades adeudadas por concepto de arrendamiento y le expresó a LV que había mantenido las facilidades abiertas en todo momento.

El apelante sostuvo que, debido a la emergencia antes descrita, estuvo impedido de utilizar las instalaciones arrendadas

---

[1] Véase, el Sistema Unificado de Manejo y Administración de Casos del TPI (SUMAC TPI, Entrada núm. 1).
[2] SUMAC TPI, Entrada núm. 13, Anejo A.

por ocho (8) semanas. En consecuencia, precisó que existe una imposibilidad en el cumplimiento del contrato y quedó liberada del pago del canon de arrendamiento desde el 15 de marzo de 2020 hasta el 7 de mayo de 2020. Puntualizó que también procedía la aplicación de la doctrina *rebus sic stantibus* y que se le redujera proporcionalmente el canon de arrendamiento por dicho periodo. Por esto fue que, junto a la demanda, consignó $33,694.93 en la Secretaría del tribunal en favor de PlazaQ.

A base de las alegaciones, el apelante le solicitó al tribunal que dictara sentencia declaratoria acogiendo sus planteamientos.

Luego de varios incidentes procesales, innecesarios pormenorizar, el 7 de agosto de 2020, el apelado presentó su *Contestación Enmendada a la Demanda y Reconvención*.[3] En esencia, negó los hechos alegados por LV y levantó como defensa afirmativa que existía una relación abogado-cliente entre LV y PlazaQ la que a raíz de la presentación de la demanda se violentó. Asimismo, esbozó que LV gozaba de un descuento en el canon de arrendamiento por virtud de un *Acuerdo Paralelo* y que las acciones de LV conllevaron que este se cancelara, lo que conllevó que la renta incrementara en $20,000 anuales. Además, indicó que cumplió sus obligaciones como arrendador, mantuvo el edificio abierto, operó con normalidad, contrató personal de limpieza adicional, y conservó y protegió toda la propiedad de LV en el local arrendado.

El apelado añadió que, durante el periodo que LV sostiene que se vio imposibilitado de operar y mantener abierta sus oficinas, este facturó y cobró la renta a su subarrendatario *Kovack Securities* (Kovack). Asimismo, PlazaQ mencionó que LV recibió fondos del *Payment Protection Program* (PPP) destinados, entre otros, al pago de renta. De igual manera, sostuvo que el apelante, sus socios y/o

---

[3] SUMAC TPI, Entrada núm. 30.

empleados no dejaron de tener acceso a las instalaciones arrendadas y, en consecuencia, nunca dejó de operar, facturar y generar ingresos. Más aún, precisó que los socios y/o empleados de LV acudieron a las oficinas a su conveniencia durante el periodo en controversia.

En cuanto a la misiva y el cheque núm. 7172, que le remitió el apelante, expuso que fue un intento de pago en finiquito, motivo por el cual lo rechazó. Además, planteó que el descuento del 20% que adjudicó LV al pago de la renta fue unilateral y que, al 15 de mayo de 2020, fecha en que se cursó la misiva a PlazaQ, los pagos correspondientes a los meses de abril y mayo ya habían vencido; y por tanto, acumularon y continúan acumulando intereses.

En cuanto a la *Reconvención*, PlazaQ presentó tres (3) alegaciones principales relacionadas con: el cobro de las rentas adeudadas por concepto del arrendamiento correspondiente a los meses de abril y mayo; el incumplimiento de contrato, en cuanto al subarrendamiento de Kovack; y los daños y perjuicios a causa del incumplimiento del convenio.

Posteriormente, el 10 de agosto de 2020, LV presentó una *Solicitud de Sentencia Sumaria*, en la cual peticionó que se dictara sentencia a su favor y que; por consiguiente, se le liberara del pago de renta por el periodo reclamado.  En la alternativa razonó que el tribunal puede aplicar la doctrina de *rebus sic stantibus* y así reducir proporcionalmente el canon de arrendamiento.[4] En el petitorio el apelante alegó que la controversia sobre la cual versa su reclamo es una exclusivamente de derecho que se atiende mediante el mecanismo de sentencia declaratoria y; por tanto, debe ser considerada y adjudicada sin necesidad de examinar cualquier otro remedio que PlazaQ pudiese tener. Además, argumentó que la

---

[4] SUMAC TPI, Entrada núm. 32.

*Reconvención* del apelado no presentó una reclamación que justificara la concesión de remedio alguno y; como cuestión de derecho, procedía su desestimación.

El 9 de septiembre de 2020, PlazaQ se opuso al pedido desestimatorio del apelante. En esencia, apuntaló que el pedido era prematuro, ya que no se ha concluido el descubrimiento de prueba, más refutó la solicitud para desestimar la reconvención.

Luego de varios trámites procesales y evaluados los antedichos escritos, el 24 de enero de 2021, notificada el 26 siguiente, el TPI emitió una *Resolución* en la que consignó catorce (14) determinaciones de hechos incontrovertidos y declaró *No Ha Lugar* a la solicitud de sentencia sumaria y desestimación.[5] En consecuencia, ordenó la continuación de los procedimientos y del descubrimiento de prueba. Enfatizamos que **el foro primario expresó que el apelante no presentó prueba de los efectos económicos que tuvieron las órdenes ejecutivas sobre las finanzas de LV, lo cual era necesario para invocar las doctrinas tanto de imposibilidad sobrevenida como la de *rebus sic stantibus*.**[6] En especial, el tribunal determinó que LV no lo colocó en condición para determinar la dificultad económica extraordinaria que enfrentó que justificara la intervención en el contrato.

En desacuerdo con el dictamen del TPI, ambas partes acudieron ante este foro apelativo. LV acudió mediante un recurso *certiorari* bajo el alfanumérico KLCE202100255, en el cual alegó que el foro *a quo* había errado en su dictamen al no mencionar, discutir ni adjudicar la reclamación principal presentada con relación a la imposibilidad sobrevenida. Un Panel hermano denegó expedir el

---

[5] SUMAC TPI, Entradas números 75 y 80.
[6] La *Resolución* del 24 de enero de 2021 solamente hizo referencia a la doctrina *rebus sic stantibus*, por lo que el apelante solicitó reconsideración, pues lo resuelto no fue en cuanto al remedio solicitado, ser liberados del pago por imposibilidad sobrevenida. Mediante una *Orden,* notificada el 1 de febrero próximo, el TPI dispuso que el dictamen aplicaba tanto al remedio solicitado como al remedio en la alternativa.

recurso al concluir que no concurrieron condiciones legítimas que ameritaran nuestra intervención. Por otra parte, PlazaQ presentó su reclamo bajo el alfanumérico KLCE202100312, en el cual impugnó determinaciones de hechos que fueron consignadas por el TPI en su *Resolución.* En este último recurso se expidió y se ordenó modificar el dictamen para eliminar la determinación de hechos núm. 7 y modificar la núm. 11.[7]

Transcurridos otros trámites procesales, y concluido el descubrimiento de prueba, el 2 de diciembre de 2024, PlazaQ presentó una *Moción de Sentencia Sumaria Parcial.*[8] En esta, esbozó treinta y nueve (39) determinaciones de hechos incontrovertidos los que, a su entender, le permitían al tribunal resolver el caso sumariamente.[9] En síntesis, sostuvo que los asuntos en controversia versaban sobre si LV cumplió o no con los requisitos establecidos para las doctrinas de imposibilidad sobrevenida y *rebus sic stantibus.* Además, se debía determinar si, a causa de las Órdenes Ejecutivas del COVID-19, la obligación del apelante para con PlazaQ, de pagar el de arrendamiento de los meses en cuestión, resultó tan onerosa que justifique se aplique una reducción al mismo.

---

[7] Es importante destacar que tanto LV como PlazaQ han recurrido ante esta *Curia* en varias ocasiones durante el desarrollo del pleito. Véanse los siguientes casos: KLCE202000944 (*Certiorari* presentado por PlazaQ referente a una *Denegatoria sobre Descalificación de Abogados.* Se denegó su expedición a base de la Regla 40 de nuestro Reglamento, pues no se presentaron los criterios para expedir.); KLCE202100121 (*Certiorari* presentado por LV referente a un dictamen de No Ha Lugar sobre una *Solicitud de Sentencia Sumaria y Desestimación de Reconvención* presentada por el apelante. El recurso se desestimó por falta de jurisdicción por prematuro.); KLCE202100255 (*Certiorari* presentado por LV, se denegó expedir el recurso, a base de la Regla 40 de nuestro Reglamento, pues no concurrieron condiciones legítimas que ameritaran la intervención de esta *Curia*.); y KLCE202100312 (*Certiorari* presentado por la parte apelada el cual fue expedido y se modificó la *Resolución* recurrida para eliminar la determinación de hechos núm. 7 y modificar la núm. 11).
[8] SUMAC TPI, Entrada núm. 174.
[9] *Íd.*, a las págs. 5-8. Incluyó como anejos los siguientes documentos: *Third (3rd) Agreement to Lease Agreement*; Requerimiento de admisiones; Deposición Sra. Gladymar Vega; correos electrónicos y facturas; carta del 15 de mayo de 2020 y cheque por $33,694.93; Deposición Sr. José Ledesma; *Rent Invoice*; y Órdenes Ejecutivas.

Adujo el apelado, que no procedía aplicar las doctrinas invocadas por LV, debido primordialmente a que el apelante falló en demostrar que le fue imposible cumplir con su obligación. Más aún, señaló que LV siempre ha estado en condiciones económicas para pagar todas sus deudas y en este sentido, no puede probar que sobrevinieron circunstancias que le imposibilitaron realizar un pago total del canon de arrendamiento. Fundamentó, además, su solicitud en que: en ningún momento a LV se les negó el acceso a las instalaciones e incluso este las visitó en varias ocasiones y utilizó los estacionamientos durante el periodo del 15 de marzo al 7 de mayo de 2020; todas las pertenencias de LV se mantuvieron en el local; y el apelante admitió que los servidores ubicados en las oficinas y funcionan como base digital, se mantuvieron instalados y funcionando, lo cual permitió el trabajo de LV de forma remota. También arguyó que la parte apelante facturó y cobró rentas producto de un subarriendo a Kovack. Asimismo, señaló que LV admitió que solicitó y recibió beneficios provenientes del PPP, cuyos fondos estaban destinados al pago de rentas y salarios.

En respuesta, el 2 de enero de 2025, el apelante presentó la moción de *Oposición a "Moción de Sentencia Sumaria Parcial" y en Solicitud de Sentencia Sumaria y Desestimación de Reconvención.*[10] En esta, expuso dos (2) hechos incontrovertidos[11], más advirtió que las controversias a resolver ante el TPI eran: si las órdenes ejecutivas le impidieron a ambas partes el cumplimiento específico de sus respectivas obligaciones durante el periodo en controversia; quedando liberada LV del pago de la renta por dicho periodo; y en la alternativa, si aplicaba la doctrina de *rebus sic stantibus*, reduciéndose el canon de arrendamiento durante el periodo en cuestión. Destacamos que LV no incluyó documentos con la moción.

---

[10] SUMAC TPI, Entrada núm. 179.
[11] *Íd.*, a la pág. 19.

A su vez, LV consignó en su escrito las determinaciones de hechos incontrovertidas esbozadas por el tribunal apelado en la *Resolución* del 24 de enero de 2021.

Por su parte, el apelante fundamentó su petitorio en que era de aplicación la normativa establecida por el Tribunal Supremo en *Rodríguez v. Municipio*, 75 DPR 482 (1975), relativa a la imposibilidad de cumplimiento. Alegó que se vio impedido de operar y abrir sus oficinas durante el periodo en controversia, a causa de las órdenes ejecutivas. Pues estas le impidieron el uso y disfrute de la propiedad arrendada. Igualmente expresó que la emergencia decretada a raíz del COVID-19 y sus consecuencias no eran previsibles al momento de la contratación con PlazaQ; así como tampoco eran imputables a LV. En la alternativa, argumentó procedía una reducción al canon de arrendamiento, pues convergen los requisitos de la doctrina *rebus sic stantibus.* Ello, como consecuencia de la imprevisibilidad de la pandemia, lo cual ocasionó fuese extremadamente oneroso para cumplir con la obligación.

Evaluados los escritos de ambas partes, el 20 de noviembre de 2025, notificada el mismo día, el TPI dictó la *Sentencia Parcial* apelada, en la cual consignó las siguientes determinaciones de hechos:[12]

1. Las partes otorgaron un contrato de arrendamiento para el alquiler de las oficinas ubicado en 221 Ave. Ponce de León, Suite 900; incluyendo, varios espacios de estacionamiento.
2. En dicho local están físicamente ubicadas las oficinas de Ledesma & Vargas, LLC.
3. El 27 de junio de 2017, las partes suscribieron lo que denominaron un "Side Agreement".
4. El 15 de marzo de 2020, ante el estado de emergencia decretado como consecuencia del COVID-19, la Gobernadora de Puerto Rico promulgó la Orden Ejecutiva Núm. OE-2020-023 estableciendo un toque

---

[12] SUMAC TPI, Entrada núm. 190, a las págs. 8-14. Énfasis nuestro y en el original más itálicas en el original y notas al calce omitidas. El TPI expresó que incluía "...los hechos que no se encuentran en controversia como resultado de la *Resolución* emitida por el Tribunal de Primera Instancia el 26 de enero de 2021 y la modificación hecha por la Sentencia emitida por el Tribunal de Apelaciones el 23 de junio de 2022." Asimismo, precisó que esbozaba "...las determinaciones de hechos fundamentadas en la *Moción de Sentencia Sumaria Parcial* presentada por PLAZAQ..." Esto, en referencia a la determinación de hechos núm. 15 en adelante.

de queda hasta el 30 de marzo y ordenando el cierre de todos los comercios privados, con excepción de algunos relacionados a la venta de alimentos, medicamentos y combustible.

5. El 30 de marzo de 2020, la Gobernadora de Puerto Rico emitió la Orden Ejecutiva Núm. OE-2020-029 extendiendo el toque de queda hasta el 12 de abril, adoptando medidas adicionales contra el COVID-19 pero manteniendo el cierre total de la mayoría del comercio privado en la isla.

6. El 12 de abril de 2020, la Gobernadora de Puerto Rico emitió la Orden Ejecutiva Núm. OE-2020-033 extendiendo el toque de queda hasta el 3 de mayo, adoptando medidas adicionales contra el COVID-19 pero manteniendo el cierre de la mayoría del comercio en el sector privado.

7. *Eliminado por Sentencia del Tribunal de Apelaciones.*

8. El 1 de mayo de 2020, la Gobernadora de Puerto Rico promulgó la Orden Ejecutiva Núm. OE-2020-038 extendiendo el toque de queda hasta el 25 de mayo, pero autorizando la reactivación de algunos sectores, entre los cuales se encontró los servicios legales.

9. La Orden Ejecutiva Núm. OE-2020-038 ordenó a cada patrono de los sectores exentos a que, previo al comienzo de retomar sus labores, preparara un plan de manejo de riesgo de contagio basado en la guía de la Administración de Salud y Seguridad Ocupacional (OSHA 3990), publicada el mes de marzo de 2020, y adoptada por la Oficina de Salud y Seguridad Ocupacional de Puerto Rico, el Departamento del Trabajo y Recursos Humanos y el Centro para el Control de Enfermedades Federal.

10. La Orden Ejecutiva Núm. OE-2020-038, dispuso que la auto certificación era un requisito para poder comenzar a operar.

11. Ledesma & Vargas completaron el plan de manejo de riesgo de contagio y sometieron el 4 de mayo de 2020 la auto certificación al Departamento del Trabajo y Recursos Humanos.

12. La[s] [Ó]rden[es] Ejecutiva[s] Núm[s]. OE-2020-023, OE-2020-029 y OE- 2020-033 [ordenaron] el cierre desde el 15 de marzo de 2020 de todo establecimiento privado que no formara parte de los servicios exentos expresamente incluidos.

13. De conformidad con estas órdenes ejecutivas, cualquier persona o corporación no exenta que incumpliera con el toque de queda estaría sujeta a una pena de reclusión de no más de seis (6) meses y/o multa de no más de $5,000.00, a discreción del Tribunal.

14. Los servicios legales no estaban comprendidos dentro de los servicios exentos del cierre desde el 15 de marzo al 1 de mayo de [2020]. Consignadas las determinaciones de hecho antes expuestas, procedemos a esbozar las determinaciones de hecho fundamentadas en la Moción de Sentencia Sumaria Parcial presentada por PLAZAQ, ante nuestra consideración.

15. L&V es una corporación dedicada a proveer servicios legales. Véase, **Hecho Incontrovertido Núm. 1 de la Moción de Sentencia Sumaria Parcial presentada por la Parte Demandada (en adelante "Sumaria Parcial") y aceptado por la Parte Demandante en la Oposición a Moción de Sentencia Sumaria Parcial (en adelante "Oposición").**

16. PLAZAQ es dueña de los locales y espacios arrendados a L&V en el Edificio 221 Plaza en la Ave. Ponce de León,

San Juan, Puerto Rico. **Véase, Hecho Incontrovertido Núm. 2 de Sumaria Parcial**.

17. Al momento de presentarse la demanda de epígrafe, el contrato de arrendamiento vigente entre L&V y PLAZAQ era el contrato de arrendamiento original "Office Space Lease Agreement" del 17 de agosto de 2012 y la tercera enmienda, fechada el 22 de junio de 2017, "Third (3rd) Amendment to Lease Agreement". **Véase, Hecho Incontrovertido Núm. 3 de Sumaria Parcial y aceptado en la Oposición.**

18. L&V realizaba el pago de arrendamiento en el mes corriente que utilizaba las facilidades. **Véase, Hecho Incontrovertido Núm. 4 de Sumaria Parcial**.

19. L&V tiene hasta el día 14 de cada mes para pagar el canon de arrendamiento a PLAZAQ. **Véase, Hecho Incontrovertido Núm. 5 de Sumaria Parcial**.

20. El canon de arrendamiento mensual de L&V para el año 2020 era por la cantidad de $21,059.33. **Véase, Hecho Incontrovertido Núm. 6 de Sumaria Parcial y aceptado en la Oposición; véase también, Réplica a la Oposición presentada por la Parte Demandada, SUMAC Núm. 183.**

21. El 15 de mayo de 2020, L&V envió una carta a PLAZAQ junto con el cheque núm. 7172, por la cantidad de $33,694.93. En la carta, L&V indica que se aplicó un 20% de descuento del total de la renta de abril y mayo de 2020. **Véase, Hecho Incontrovertido Núm. 7 de Sumaria Parcial.**

22. La carta enviada por L&V el 15 de mayo de 2020 indica que la aceptación del cheque constituye la aceptación del descuento. **Véase, Hecho Incontrovertido Núm. 8 de Sumaria Parcial y aceptado en la Oposición**.

23. PLAZAQ no aceptó el pago parcial y solicitó el pago total del arrendamiento. **Véase, Hecho Incontrovertido Núm. 9 de Sumaria Parcial y aceptado en la Oposición**.

24. Durante marzo, abril y mayo de 2020, L&V tuvo en la oficina servicio de energía eléctrica, agua e internet. **Véase, Hecho Incontrovertido Núm. 12 de Sumaria Parcial.**

25. Durante marzo, abril y mayo de 2020, L&V no se vio obligada a sacar su servidor o muebles de la oficina. **Véase, Hecho Incontrovertido Núm. 13 de Sumaria Parcial**.

26. **El servidor que L&V utilizaba para su sistema de base digital en la oficina estuvo instalado y funcionando**. **Véase, Hecho Incontrovertido Núm. 14 de Sumaria Parcial**.

27. **Durante marzo, abril y mayo 2020 algunos empleados de L&V visitaron la oficina alquilada**. **Véase, Hecho Incontrovertido Núm. 5 de Sumaria Parcial**.

28. **El licenciado José Ledesma visitó en varias ocasiones el espacio alquilado y se estacionó en el estacionamiento. Véase, Hecho Incontrovertido Núm. 16 de Sumaria Parcial**.

29. El licenciado Javier Rivera Longchamps visitó en varias ocasiones la oficina alquilada. **Véase, Hecho Incontrovertido Núm. 17 de Sumaria Parcial**.

30. **Miembros de L&V visitaron en varias ocasiones el espacio alquilado**. **Véase, Hecho Incontrovertido Núm. 18 de Sumaria Parcial**.

31. **La administradora de L&V, Gladymar Vega, visitó la oficina el 15 de marzo de 2020 para buscar información básica para trabajar de forma remota, como los dispositivos que se utilizan para tramitar**

la nómina de forma remota y banca "online". **Véase, Hecho Incontrovertido Núm. 19 de Sumaria Parcial y aceptado en la Oposición.**

32. **Durante marzo, abril y mayo de 2020, cuando se suponía que no se trabajara físicamente en la oficina, la administradora de L&V estuvo bastantes horas trabajando desde la casa conectada a la computadora de la oficina**. **Véase, Hecho Incontrovertido Núm. 20 de Sumaria Parcial.**

33. **A pesar de la orden ejecutiva, ninguna persona le dijo a la administradora de L&V "usted no puede entrar al edificio". Véase, Hecho Incontrovertido Núm. 21 de Sumaria Parcial**.

34. Durante marzo, abril y mayo 2020, el servidor, escritorios y la mayoría de los muebles y equipos permanecieron guardados dentro de la oficina alquilada. **Véase, Hecho Incontrovertido Núm. 22 de Sumaria Parcial.**

35. **L&V no tuvo que sacar sus pertenencias. Véase, Hecho Incontrovertido Núm. 23 de Sumaria Parcial**.

36. **Durante marzo, abril y mayo de 2020, PLAZAQ no realizó acto alguno que impidiera a L&V a utilizar la oficina alquilada. Véase, Hecho Incontrovertido Núm. 24 de Sumaria Parcial.**

37. **L&V subarrendó parte del espacio de su oficina a José Fidalgo (Kovack Securities) desde enero de 2020 hasta julio de 2022**. **Véase, Hecho Incontrovertido Núm. 25 de Sumaria Parcial**.

38. **Kovack Securities es una firma de inversión o de "financial advisors" que alquilaba un espacio a L&V. Véase, Hecho Incontrovertido Núm. 26 de Sumaria Parcial.**

39. **L&V emitió un reporte de "rent invoices" a José A. Fidalgo para el periodo de enero a diciembre de 2020. Véase, Hecho Incontrovertido Núm. 27 de Sumaria Parcial**.

40. **Para el periodo que José Fidalgo subarrendó el espacio de oficina a L&V, incluyendo enero de 2020 a julio de 2022, José Fidalgo pagó el arrendamiento completo a L&V y no tenía balance pendiente. Véase, Hecho Incontrovertido Núm. 28 de Sumaria Parcial.**

41. **Para marzo, abril y mayo de 2020, José A. Fidalgo pagó el canon de arrendamiento a L&V**. **Véase, Hecho Incontrovertido Núm. 29 de Sumaria Parcial**.

42. **L&V solicitó y recibió un préstamo del Paycheck Protection Program ("PPP")**. **Véase, Hecho Incontrovertido Núm. 30 de Sumaria Parcial.**

43. **Los fondos del PPP estaban destinados para el pago de renta y el pago de salarios**. **Véase, Hecho Incontrovertido Núm. 31 de Sumaria Parcial**.

44. **FirstBank es cliente de L&V**. **Véase, Hecho Incontrovertido Núm. 32 de Sumaria Parcial**.

45. **L&V le provee servicios legales a FirstBank. Véase, Hecho Incontrovertido Núm. 32 de Sumaria Parcial**.

46. **Para marzo, abril y mayo de 2020 FirstBank era cliente de L&V**. **Véase, Hecho Incontrovertido Núm. 34 de Sumaria Parcial**.

47. **Las Órdenes Ejecutivas OE-2020-023, OE-2020-029 y OE-2020-033 expresamente eximieron del cierre de operaciones a las instituciones bancarias o financieras. Véase, Hecho Incontrovertido Núm. 35 de Sumaria Parcial**.

48. **L&V reconoce que FirstBank es una institución financiera que estaba exenta del cierre para el periodo de marzo, abril y mayo de 2020 y que se**

**podían hacer cierres hipotecarios**. Véase, Hecho Incontrovertido Núm. 36 de Sumaria Parcial.

49. **Las órdenes ejecutivas no le impedían a L&V prestar servicios legales desde las casas**. Véase, Hecho Incontrovertido Núm. 37 de Sumaria Parcial.

50. **José Ledesma buscó expedientes a la oficina para mantenerse al día y poder tener "telephone conference calls" con gente de Estados Unidos desde su casa. Véase, Hecho Incontrovertido Núm. 38 de Sumaria Parcial**.[13]

Además, el TPI determinó que la solicitud sumaria de PlazaQ cumplió con los requisitos de la Regla 36 de las de Procedimiento Civil, *supra*, no así la *Oposición* instada por el apelante. Sin embargo, a pesar de ello el tribunal de instancia evaluó ambas solicitudes; así como la totalidad del expediente.

El TPI apuntaló, además, que PlazaQ cursó a LV un requerimiento de admisiones que no respondió dentro del plazo dispuesto en la Regla 33 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 33. Por tanto, decretó que los requerimientos de admisiones automáticamente se tuvieron por admitidos sin ulterior trámite.

A su vez, declaró *Ha Lugar* a la *Solicitud de Sentencia Parcial* presentada por el apelado. Por consiguiente, desestimó la demanda presentada por LV en contra de PlazaQ. Respecto a las solicitudes presentadas por LV dictaminó *No Ha Lugar* a las mismas. En particular, respecto al petitorio de LV, citó la *Resolución* dictada el 24 de enero de 2021 mediante la cual ya había resuelto los mismos planteamientos y expresó que estos constituyen dictámenes finales, conforme a la doctrina de la ley del caso.

Enfatizamos que, respecto al criterio de la doctrina *rebus sic stantibus,* referente a que era imposible o excesivamente oneroso para LV cumplir con su obligación de pagar el canon de arrendamiento debido a PLAZAQ, el foro primario razonó que:[14]

> Consecutivamente, el quinto requisito de la doctrina de imposibilidad sobrevenida requiere que para L&V sea objetivamente imposible o excesivamente oneroso cumplir con su obligación de pagar renta a PLAZAQ.

---

[13] SUMAC TPI, Entrada núm. 190.

[14] *Íd.*, a las págs. 30-31. Énfasis en el original y nuestro.

Aun reconociendo la imprevisibilidad del COVID-19, ello no basta para justificar la aplicación de doctrinas por excepción como la imposibilidad sobrevenida. Por sí sola no puede implicar que se deban modificar y/o anular las obligaciones contractuales asumidas con anterioridad a este evento. Tal proceder amenazaría la estabilidad de las negociaciones y las relaciones contractuales y económicas. En consecuencia, resulta necesario un análisis particularmente riguroso a fin de salvaguardar la estabilidad contractual.

Surge del expediente que el tribunal notific[ó] a las partes una Resolución el 3 de febrero de 2021 en la que expres[ó] en lo pertinente "[n]o ha lugar, la resolución aplica tanto al remedio solicitado como al remedio solicitado en la alternativa ya que **para ambos casos el tribunal debe recibir prueba de los efectos económicos que tuvieron las órdenes ejecutivas sobre las finanzas de la firma**." [SUMAC Núm. 80]. (Énfasis nuestro). **Aun así, no surge del expediente que L&V presentara prueba alguna según requerida en la referida *Resolución*.**

Además, en este caso, los hechos materiales probados establecen que L&V subarrendó el espacio a otra empresa que sí utilizó el local y pagó en su totalidad. **Véase, Hechos Incontrovertidos Núms. 22-29**. Esto refleja que L&V generó ingresos. Asimismo, L&V continuó generando ingresos por servicios a FirstBank, que era una entidad exenta por las órdenes ejecutivas. **Véase, Hechos Incontrovertidos Núms. 32- 38.** Por otra parte, la Parte Demandante recibió fondos del Paycheck Protection Program (PPP) expresamente para cubrir gastos de renta. **Id., Núm. 30.** Sin embargo, L&V no controvirtió los siguientes hechos materiales probados por PLAZAQ.

Con base en estos hechos podemos concluir que L&V no satisface este requisito. Los hechos probados muestran que para L&V no fue objetivamente imposible ni excesivamente oneroso pagar la renta debida a PLAZAQ.

En desacuerdo, el 5 de diciembre de 2025, LV presentó oportuna una moción en solicitud de reconsideración y para la eliminación de determinaciones de hechos, a la cual se opuso el apelado. Mediante la *Resolución,* emitida y notificada el 8 de enero de 2026, el foro primario denegó el petitorio.

Aún inconforme con esta determinación, el apelante acude ante esta *Curia* imputándole al TPI haber cometido los siguientes errores:

COMETIÓ GRAVE ERROR Y ABUSÓ DE SU DISCRECIÓN EL TRIBUNAL DE PRIMERA INSTANCIA AL NO DECLARAR QUE LAS ÓRDENES EJECUTIVAS QUE PROHIBIERON EL USO Y DISFRUTE DE LA PROPIEDAD ARRENDADA CONSTITUYÓ UN EXIMENTE DEL CUMPLIMIENTO DE LA OBLIGACIÓN

DEL PAGO DE RENTA DURANTE DICHO PERÍODO, CONFORME ESTABLECE EL PRINCIPIO GENERAL DE DERECHO DE LA DOCTRINA DE IMPOSIBILIDAD SOBREVENIDA.

COMETIÓ GRAVE ERROR Y ABUSÓ DE SU DISCRECIÓN EL TRIBUNAL DE PRIMERA INSTANCIA AL NEGARSE A ELIMINAR DETERMINACIONES DE HECHOS FORMULADAS QUE NO CONSTITUÍAN HECHOS MATERIALES, ESENCIALES NI PERTINENTES A LA MATERIA OBJETO DE LA SENTENCIA SUMARIA PARCIAL DICTADA.

El 6 de febrero de 2026, emitimos una *Resolución* concediéndole a la parte apelada, hasta el 9 de marzo de 2026, para expresarse. Llegado ese día, dicha parte solicitó una prórroga, la cual fue concedida. El 12 de marzo de 2026 se cumplió con lo ordenado, por lo que nos damos por cumplidos y, a su vez, decretamos perfeccionado el recurso.

Analizados los escritos de las partes; así como estudiado el derecho aplicable, procedemos a resolver.

## II.

### Mecanismo de Sentencia Sumaria

En nuestro ordenamiento jurídico, el mecanismo de la sentencia sumaria está gobernado por la Regla 36 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36, la cual autoriza a los tribunales a dictar sentencia de forma sumaria si, mediante declaraciones juradas u otro tipo de prueba, se demuestra la inexistencia de una controversia sustancial de hechos esenciales y pertinentes. *Soto y otros v. Sky Caterers*, 2025 TSPR 3, 215 DPR ___ (2025); *Cruz, López v. Casa Bella y otros*, 213 DPR 980, 993 (2024) Específicamente, la Regla 36.1, 32 LPRA Ap. V, R. 36.1, atiende la solicitud de este tipo de disposición a favor de la parte reclamante en un pleito, mientras que la Regla 36.2, 32 LPRA Ap. V, R. 36.2, permite su petición a favor de la parte contra la que se reclama. En ambas reglas se establece lo siguiente:

**Regla 36.1. A favor de la parte reclamante**

Una parte que solicite un remedio podrá presentar, […], una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación solicitada.

**Regla 36.2. A favor de la parte contra quien se reclama**

Una parte contra la cual se haya formulado una reclamación podrá presentar, […], una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación.

Entretanto, la Regla 36.3, 32 LPRA Ap. V, R. 36.3, dispone los requisitos de contenido de la moción de sentencia sumaria y de la contestación a esta, entre otras particularidades del procedimiento. Estos requisitos, como los párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, no son un mero formalismo, ni constituye un simple requisito mecánico sin sentido. *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 434 (2013).

En un primer plano, mediante el uso del mecanismo discrecional de la sentencia sumaria, se aligera la tramitación de un caso, puesto que, ante la ausencia de controversia de hechos, al tribunal solo le corresponde aplicar el derecho. *Oriental Bank v. Perapi et al.,* 192 DPR 7, 25 (2014). Así, sirve para propiciar la solución justa, rápida y económica de los litigios civiles que no presentan controversias genuinas de hechos materiales y que, por lo tanto, no requieren la celebración de un juicio en su fondo, ya que lo único que resta es dirimir una o varias controversias de derecho. *Íd.*

Este tipo de resolución procede en aquellos casos en los que no existen controversias **reales y sustanciales,** en cuanto a los **hechos materiales y; por lo tanto, lo único que resta es aplicar**

**el derecho**. *Consejo Tit. v. Rocca Dev. Corp.*, et als., 215 DPR ___, 2025 TSPR 6 (2025); *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 109 (2015). La precitada Regla 36 de las de Procedimiento Civil, *supra,* dispone, en esencia, que para permitir este tipo de adjudicación resulta necesario que, de las alegaciones, deposiciones, contestaciones a interrogatorios, admisiones, declaraciones juradas y cualquier otra evidencia surjan que no existe controversia real y sustancial respecto a ningún hecho esencial y pertinente; y en adición, que se deba dictar sentencia sumaria como cuestión de derecho. *Consejo Tit. v. Rocca Dev. Corp., et als.,* supra; *Meléndez González et al. v. M. Cuebas*, supra, a la pág. 109. En este sentido, solo procede dictarla cuando surge, de manera clara que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el derecho aplicable y que el tribunal cuenta con la verdad de todos los hechos necesarios para resolver la controversia. *Meléndez González et al. v. M. Cuebas,* supra, a las págs. 109-110.

Es decir, por un lado, al promovente de la moción le toca establecer su derecho con claridad y demostrar que no existe controversia en cuanto a ningún hecho material, o sea, ningún componente de la causa de acción. *Íd.*, a la pág. 110. Por el otro, al oponente le corresponde establecer que existe una controversia que sea real en cuanto a algún hecho material y, en ese sentido, no cualquier duda es suficiente para derrotar la solicitud de sentencia sumaria. *Íd.* Cabe recordar que, en este contexto, un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Íd.* Más específicamente, el oponente debe controvertir la prueba presentada y no debe cruzarse de brazos; pues de lo contrario, se expone a que se acoja la solicitud de sentencia sumaria y se le dicte en contra. *Ramos Pérez v. Univisión,* 178 DPR 200, 214-215 (2010). Esto significa que está

obligado a contestar, de forma detallada y específica, aquellos hechos pertinentes que demuestran la existencia de una controversia real y sustancial que requiere dilucidarse en un juicio. *Íd.*, a la pág. 215. En este ejercicio, debe presentar declaraciones juradas o documentos que pongan en controversia los hechos alegados por el promovente, recordando que tampoco puede descansar en meras alegaciones, sino que debe proveer evidencia sustancial de los hechos materiales en disputa. *Íd.*

No obstante, no oponerse a la solicitud de sentencia sumaria no implica ni que procederá dictarla obligatoriamente, si existe una controversia legítima sobre un hecho material, ni que corresponderá dictarla a favor de su proponente si no procede en derecho. *Íd.*

Ahora bien, se han establecido ciertas reglas limitantes de la discreción en el uso de la moción de sentencia sumaria. Por un lado, la determinación en cuanto a esta debe guiarse por un principio de liberalidad a favor de la parte que se opone, lo cual persigue evitar la privación del derecho de todo litigante a su día en corte cuando existen controversias de hechos legítimas y sustanciales que deben ser resueltas. *Íd.*, a las págs. 216-217. Por el otro, como norma general, los tribunales están impedidos de dictar sentencia sumaria en cuatro instancias cuando: (1) existan hechos materiales y esenciales controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) de los propios documentos que acompañan la moción surge que existe una controversia sobre algún hecho material y esencial; o (4) como cuestión de derecho no procede. *Negrón Castro y otros v. Soler Bernardini y otros*, 2025 TSPR 96, 216 DPR ___ (2025). *Oriental Bank v. Perapi*, supra, a las págs. 26-27. Dicho esto, cabe indicar que la moción de sentencia sumaria no está excluida en ningún tipo de pleito, puesto que, sin importar cuán complejo sea un pleito, puede dictarse si de una moción de sentencia sumaria bien fundamentada surge que no hay

controversia sobre hechos materiales. *Meléndez González et al. v. M. Cuebas*, supra, a la pág. 112.

En lo relativo al ejercicio de la facultad revisora de este Tribunal de Apelaciones, sobre la procedencia de la sentencia sumaria, **debemos utilizar los mismos criterios que el Tribunal de Primera Instancia**. *Meléndez González et al. v. M. Cuebas*, supra, a la pág. 115. En *Meléndez González,* el Tribunal Supremo consignó el siguiente estándar:

> "Primero, reafirmamos lo que establecimos en *Vera v. Dr. Bravo, supra*, a saber: **el Tribunal de Apelaciones se encuentra en la misma posición del Tribunal de Primera Instancia al momento de revisar Solicitudes de Sentencia Sumaria.** En ese sentido, está regido por la Regla 36 de Procedimiento Civil, *supra*, y aplicará los mismos criterios que esa regla y la jurisprudencia le exigen al foro primario. Obviamente, el **foro apelativo intermedio estará limitado en cuanto a que no puede tomar en consideración evidencia que las partes no presentaron ante el Tribunal de Primera Instancia y tampoco adjudicar los hechos materiales en controversia, ya que ello le compete al foro primario luego de celebrado un juicio en su fondo**. La revisión del Tribunal de Apelaciones es de *novo* y debe examinar el expediente de la manera más favorable hacia la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor.
>
> Segundo, por estar en la misma posición que el foro primario, el Tribunal de Apelaciones debe revisar que tanto la Moción de Sentencia Sumaria como su Oposición **cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civi**l, supra, y discutidos en *SLG Zapata-Rivera v. J.F. Montalvo*, supra.
>
> Tercero, **en el caso de revisión de una Sentencia dictada sumariamente**, el Tribunal de Apelaciones **debe revisar si en realidad existen hechos materiales en controversia**. De haberlos, el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos. Esta determinación se puede hacer en la Sentencia que disponga del caso y puede hacer referencia al listado numerado de hechos incontrovertidos que emitió el foro primario en su Sentencia.
>
> Cuarto y, por último, de encontrar que los hechos materiales realmente están incontrovertidos, el foro apelativo intermedio procederá entonces a revisar de *novo* si el Tribunal de Primera Instancia **aplicó correctamente el Derecho a la controversia**." (Énfasis nuestro). *Meléndez González et al. v. M. Cuebas,* supra, a las págs. 118-119.

Por último, esta norma ha sido reiterada año tras año por nuestro Tribunal Supremo, en donde ha establecido que los foros apelativos nos encontramos en la misma posición que los foros de primera instancia al evaluar la procedencia de una **sentencia sumaria**. *Soto y otros v. Sky Caterers*, 2025 TSPR 3, 215 DPR ___ (2025); *Cruz, López v. Casa Bella y otros*, 213 DPR 980, 993 (2024); *Birriel Colón v. Econo y otro*s, 213 DPR 80, 91-92 (2023). Sin embargo, nuestra función se limita a: (1) considerar los documentos que se presentaron ante el foro de primera instancia; (2) determinar si existe alguna controversia genuina de hechos materiales y esenciales, y (3) comprobar si el derecho se aplicó de forma correcta. *Negrón Castro y otros v. Soler Bernardini y otros, supra; Soto y otros v. Sky Caterers, supra; Cruz, López v. Casa Bella y otros, supra,* a la pág. 993*; Birriel Colón v. Econo y otros,* supra, a la pág. 91-92. Cónsono a ello, también se ha establecido que los tribunales revisores estamos llamados a examinar el expediente *de novo* de la manera más favorable hacia la parte que se opone a la solicitud de sentencia sumaria en el foro primario y realizando todas las inferencias permisibles a su favor. *Soto y otros v. Sky Caterers*, supra; *Birriel Colón v. Econo y otro, supra,* a las págs. 91-92.

**Teoría general de los contratos**

En nuestro ordenamiento jurídico, *"[l]as obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia".[15]* (Énfasis nuestro). Artículo 1042 del Código Civil, 31 LPRA sec. 2992. Las obligaciones contractuales tienen fuerza de ley entre las partes y deben cumplirse a tenor con lo así pactado. Artículo 1044 del Código Civil, 31 LPRA sec. 2994. En virtud del principio conocido

---

[15] El Código Civil de 1930 fue derogado por la Ley núm. 55-2020, también conocida como el *Código Civil de Puerto Rico de 2020*, la cual entró en vigor el 28 de noviembre de 2020. Por lo que, en la controversia ante nuestra consideración el Código Civil de 1930 era el que estaba en vigor.

como la autonomía de la voluntad, los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarios a la ley, a la moral, ni al orden público. Artículo 1207 del Código Civil, 31 LPRA sec. 3372; *Oriental Finance v. Nieves*, 172 DPR 462, 470-471 (2007); *Vélez v. Izquierdo*, 162 DPR 88, 98 (2004). Así pues, una vez perfeccionado un contrato, las partes que lo suscriben están sujetas, además de honrar el cumplimiento de lo pactado, a *"todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley"*. Artículo 1210 del Código Civil, 31 LPRA sec. 3375; *Banco Popular de P.R. v. Sucn. Talavera*, 174 DPR 686 (2008).

Por otra parte, cabe destacar que la regla general en cuanto a la interpretación de los contratos es que *"si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas"*. Artículo 1233 del Código Civil, 31 LPRA sec. 3471; *CFSE v. Unión de Médicos de la CFSE*, 170 DPR 443, 450 (2007); *Rivera v. Rivera*, 168 DPR 193, 212 (2006); *Trinidad v. Chade*, 153 DPR 280, 289 (2001). En ese sentido, el Tribunal Supremo ha señalado que:

> "[s]olo pueden ser reputados como términos claros aquellos que por sí mismos son bastante lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones, y sin necesitar para su comprensión razonamientos o demostraciones susceptibles de impugnación". *Sucn. Ramírez v. Trib. Superior*, 81 DPR 357, 361 (1959).

La norma es que la intención de las partes *"es el criterio fundamental [...] para fijar el alcance de las obligaciones contractuales." Marina Ind., Inc. v. Brown Boveri Corp.*, 114 DPR 64, 69 (1983), citando a *Merle v. West Bend Co.*, 97 DPR 403, 409 (1969). Ahora bien, al evaluar la intención de los contratantes, los tribunales debemos atender, no solo los actos anteriores, coetáneos y posteriores al contrato, sino también las circunstancias indicativas de la voluntad de las partes. Artículo 1234 del Código

Civil, 31 LPRA sec. 3472; *Marina Ind., Inc. v. Brown Boveri Corp,* *supra,* a la pág. 69; *Blas v. Hospital Guadalupe,* 167 DPR 439, 450–451 (2006). Cónsono con lo anterior, al examinar la intención contractual, "resulta de suma importancia tomar en consideración quiénes son las partes, en particular sus experiencias y conocimientos especializados sobre la materia sobre la cual versa el contrato". *Unysis v. Ramallo Brothers,* 128 DPR 842, 853 (1991).

Además, las cláusulas de un contrato deben interpretarse de forma integrada, y no aisladamente, por lo que debe buscarse su verdadero sentido en la relación de unas cláusulas con las otras del mismo instrumento. La interpretación final debe ser cónsona con el principio de la buena fe y no llevar a resultados incorrectos, absurdos e injustos para alguna de las partes. *Guadalupe Solís v.* *González Durieux,* 172 DPR 676, 685 (2007).

**La doctrina de la Imposibilidad Sobrevenida**

El Código Civil reconoce como **una de las causas de extinción de las obligaciones que libera al deudor**, la imposibilidad sobrevenida. En específico dispone que *quedará* *liberado el deudor en las obligaciones de hacer cuando la prestación* *resultare legal o físicamente imposible.* Artículo 1138 del Código Civil, 31 LPRA sec. 3193. En cuanto al cumplimiento imposible, nuestro más alto foro en *Rodríguez v. Municipio,* 75 DPR 479, 490 (1953) explicó que *se produce cuando examinadas las circunstancias* *en que se firma un contrato y las circunstancias en que debe* *cumplirse posteriormente, resulta que su cumplimiento posterior no es* *posible, por la sobrevivencia de ciertos hechos que no existían al* *momento de contraerse la obligación.* Cónsono a ello adoptó la siguiente norma:

> **En obligaciones recíprocas, donde ha habido un** **cumplimiento parcial de la obligación**, cuando sin culpa del obligado sobrevienen una serie de circunstancias que hagan imposible el cumplimiento total de la obligación, el obligado queda relevado de

cumplir con aquella parte del contrato cuyo cumplimiento se ha hecho imposible, y a menos que el obligado haya asumido expresamente el riesgo de circunstancias imprevisibles, de las cuales hubiera podido tener plena conciencia al momento de firmar el contrato, tiene derecho a recobrar cualesquiera servicios prestados, acopio de materiales y mano de obra hasta el momento mismo en que se produzca la imposibilidad para el cumplimiento final de la obligación; aunque la acción de guerra y el acto de Dios quedan comprendidos dentro [de] la imposibilidad en el cumplimiento no excluyen otras circunstancias que creen una excesiva onerosidad para el obligado. *Rodríguez v. Municipio,* supra*,* en la pág. 494. (Énfasis nuestro)

Para determinar si surgieron circunstancias que imposibilitaron el cumplimiento de las prestaciones que conlleven la extinción de la obligación que libere al deudor, nuestro más alto foro en *Rodríguez v. Municipio,* supra, a la pág. 495, aplicó el siguiente análisis; (1) si el obligado está exento de culpa en el cumplimiento; (2) si las circunstancias no existían al momento de firmarse el contrato, y que cuando sobrevienen hacen imposible el cumplimiento; (3) si las cosas objeto del contrato no pueden restituirse en especie; y (4) si el obligado no asumió expresamente y por escrito el riesgo de circunstancias imprevisibles.

### *Rebus sic stantibus*

La cláusula *rebus sic stantibus,* como fundamento para revisar los términos de un contrato, surge de diversos principios de la teoría general de las obligaciones y los contratos, tales como la buena fe, el abuso del derecho y la equidad contractual. *BPPR v. Sucn. Talavera*, 174 DPR 686, 694 (2008); *Casera Foods, Inc. v. E.L.A.*, 108 DPR 850, 855 (1979). Tratándose la cláusula *rebus sic stantibus* de una condición que se encuentra implícita en el contrato, esta doctrina "parte del supuesto que los contratos de tracto sucesivo o de cumplimiento aplazado obligan mientras no ocurran cambios importantes en el estado de hechos contemplado por las partes al momento de contratar". *Íd.*, pág. 694.

Esta sirve para atemperar la inflexibilidad y severidad del principio de *pacta sunt servanda* establecido en el Artículo 1044 del Código Civil, 31 LPRA sec. 2994, permitiéndole al tribunal intervenir en el contrato y evitar que se lacere la buena fe o que se cause una injusticia al obligar su cumplimiento específico. *BPPR v. Sucn. Talavera*, supra, pág. 695.

A su vez, esta doctrina "representa un contrapeso a la rigidez y absolutismo expuesto en la prédica de sostener a ultranza, en todo momento y circunstancia, la voluntad contractual de las partes simbolizada en la conocida máxima *pacta sunt servanda*". *Casera Foods Inc. v. E.L.A.*, supra, pág. 854.

Los requisitos establecidos por nuestra jurisprudencia para que proceda la aplicación de la doctrina son los siguientes: "que (1) ocurra una circunstancia imprevisible como una cuestión de hecho dependiente de las condiciones que concurran en cada caso, lo cual es un requisito fundamental; (2) el cumplimiento con las prestaciones del contrato sea extremadamente oneroso, lo cual también es una cuestión de hechos; (3) no se trate de un contrato aleatorio o haya un elemento de riesgo que sea determinante; (4) ninguna de las partes haya incurrido en algún acto doloso; (5) se trate de un contrato de tracto sucesivo o que esté referido a un momento futuro; (6) la alteración de las circunstancias sea posterior a la celebración del contrato y que presente un carácter de cierta permanencia, y (7) que una parte invoque la aplicación de la doctrina". *Oriental Bank v. Perapi et al.*, 192 DPR 7, 17 (2014), citando a *Casera Foods Inc. v. E.L.A.*, supra, pág. 856. Todos los requisitos deben concurrir para la aplicación de la doctrina, salvo que "se alteren las bases del negocio de forma tal que desaparezca la causa que dio origen al contrato y las prestaciones entre las partes se tornen desproporcionales entre sí". *Íd.*, pág. 19.

Por último, la aplicación del principio de *rebus sic stantibus*, que tiene el efecto de liberar a una parte de cumplir con los términos pactados en un contrato, es un remedio de excepción reservado únicamente para situaciones extraordinarias. *Oriental Bank v. Perapi et al.*, supra, pág. 19.

**III.**

El apelante, en su primer señalamiento de error, arguyó, en esencia, que el TPI incidió al declarar que la doctrina de imposibilidad sobrevenida no aplicaba a la situación en controversia. Alegó que las Órdenes Ejecutivas emitidas, a raíz de la emergencia por el COVID-19, le prohibió el uso y disfrute de la propiedad arrendada, en cuya consecuencia LV quedó liberado de la obligación del pago de renta durante el periodo del 15 de marzo al 7 de mayo de 2020. Mientras en su segundo error, argumentó que el foro primario erró al no eliminar determinaciones de hechos que según aduce no constituyen hechos materiales, esenciales ni pertinentes a la materia objeto de la *Sentencia Sumaria Parcial* dictada. Adelantamos que no le asiste la razón.

Como cuestión de umbral, al ejercer nuestra función revisora, respecto a una moción de sentencia sumaria, debemos examinar de *novo* el expediente y aplicar los criterios que la Regla 36 de las de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario y revisar que, tanto la moción de sentencia sumaria como su oposición, cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*. Asimismo, nos corresponde revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36.4, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar de *novo* si el Tribunal

de Primera Instancia aplicó correctamente el derecho a la controversia. *Roldán Flores v. M. Cuebas*, 199 DPR 664, 679 (2018).

Tras un minucioso análisis de la totalidad del expediente, y en especial, examinadas las mociones de sentencia sumaria y su oposición, colegimos con el foro primario al entender que el escrito de PlazaQ cumplió con los requisitos establecidos en la Regla 36 de las de Procedimiento Civil, *supra*. De igual manera, coincidimos en que el apelante no cumplió con los requerimientos esbozados en la regla, en cuanto a su escrito en oposición, al fallar en controvertir los hechos según se exige en la norma. En consecuencia, resulta correcto el raciocinio del TPI respecto a que, los hechos no controvertidos, se entienden como probados.

Aclarado este asunto, y en lo concerniente a la controversia ante nuestra consideración, las partes tenían entre sí obligaciones recíprocas. Las partes cumplieron con las contraprestaciones convenidas hasta el pago del arrendamiento correspondiente a marzo de 2020. Asimismo, surge del expediente que PlazaQ continuó cumpliendo con las obligaciones contraídas y el apelante visitó en varias ocasiones las instalaciones y pudo continuar sus labores de forma remota mediante el servidor que se encontraba en las oficinas.

De igual manera, no cade duda de que LV incumplió con su obligación de emitir los pagos por el arrendamiento correspondientes a los meses de abril y mayo 2020, e intentó unilateralmente adjudicarse un descuento de 20% en los pagos adeudados, lo cual fue rechazado por el apelado. Por lo que, a raíz de tal rechazo, LV consignó $33,694.93 en el tribunal, como el pago correspondiente a los meses adeudados con el descuento adjudicado y solicitó sentencia declaratoria.

Conforme surge del escrito apelativo y como fuera planteado en el TPI, el apelante insiste en que es aplicable a la controversia de autos la doctrina de imposibilidad sobrevenida o en la alternativa la

doctrina *rebus sic stantibus*. Sostiene LV que procede debido a que las Órdenes Ejecutivas emitidas por la entonces Gobernadora le prohibió el uso y disfrute de las oficinas. Así, arguye que dicha circunstancia en sí constituye un eximente del pago bajo la doctrina de imposibilidad sobrevenida. En la alternativa, afirma que corresponde aplicar un ajuste en la cantidad a pagar, pues les resulta extremadamente oneroso cumplir con el pago total del arrendamiento.

Destacamos que se hace preciso señalar que, para aplicar la doctrina de imposibilidad sobrevenida, es imperativo que la obligación resultara imposible de cumplir o que cumplirla fuese extremadamente oneroso. En el caso de autos, LV no logró demostrarlo. Un análisis de la totalidad de las circunstancias revela que pagar el arrendamiento no era imposible ni extremadamente oneroso. Al respecto, LV **estuvo dispuesto a pagar el 80% de la renta y más aún, consignó $33,694.93 en el tribunal, cuantía equivalente a este porcentaje**. Tampoco presentó evidencia de los efectos económicos que tuvieron las Órdenes Ejecutivas sobre las finanzas de la firma como coligió el TPI desde la *Resolución* emitida el 24 de enero de 2021.

Asimismo, no obviemos que LV recibió beneficios económicos para el pago de renta y nómina; así como continuó recibiendo el pago del espacio subarrendado.

Cónsono a lo anterior, resulta importante destacar y reiterar que **el mero hecho de invocar que el Gobierno de Puerto Rico impuso órdenes, por motivo de la pandemia del COVID, resulta insuficiente** para aplicar tanto la doctrina de imposibilidad sobrevenida como la doctrina *rebus sic stantibus*. Esto, debido a que, como expresó un Panel hermano en el caso KLAN202200572[16] y que

---

[16] Panel integrado por su Presidente el juez Sánchez Ramos, el juez Rivera Torres como Ponente y el juez Salgado Schwarz.

hoy reiteramos **es necesario poner al tribunal apelado en condición de determinar si aplica el axioma jurídico**. En este aspecto, es **imprescindible presentar prueba de los efectos económicos que tuvieron las órdenes ejecutivas** sobre sus finanzas. Aún más, cuando en las subsiguientes Órdenes Ejecutivas se fueron flexibilizando paulatinamente las limitaciones en la operación de los comercios. Por lo cual, el impedimento no fue uno permanente.

Reiteramos que, en la *Resolución* emitida por el TPI, el 24 de enero de 2021, el TPI razonó que "No surge de la solicitud de sentencia sumaria [presentada por LV], sus anejos o el expediente cuánto se afectó la economía de la parte demandante, si bajaron sus ingresos durante los meses en que no pudieron acceder a la oficina y por cuánto; de manera que justifique que este tribunal intervenga en un contrato que es la ley entre las partes. Según establecido por la jurisprudencia, los tribunales no tenemos que ceñirnos a estos siete criterios cuando desaparece la base del negocio y falla la causa del contrato, sin embargo, este no es el caso."[17]

En virtud de lo antedicho, reiteramos es el deber de quien levanta el argumento de imposibilidad de cumplimiento en la obligación, en casos como el de autos, probar que las restricciones impuestas por el Gobierno alteraron las bases del negocio jurídico. De tal manera que desapareció la causa que originó el contrato y que las prestaciones se tornaron desproporcionales o imposibles entre sí. Es decir, **las doctrinas reclamadas no pueden operar en el vacío** como inferimos es la pretensión del apelante, tanto en el TPI como ante esta *Curia*. Pues, para que proceda la aplicación de las referidas doctrinas, resulta imperativo que concurran todos los requisitos previamente detallados y que el apelante demuestre que

---

[17] SUMAC, Entrada núm. 75, a las págs. 6-7.

le resultó imposible o extremadamente oneroso cumplir con sus obligaciones.

En fin, el tribunal primario actuó de manera razonable. Del expediente ante nuestra consideración surge que el apelado presentó, en su solicitud de sentencia sumaria, prueba y admisiones del propio apelante de que durante el tiempo que reclaman se les exima del pago de renta, este recibió fondos provenientes de un subarrendamiento de una parte del local en cuestión y del PPP. Hechos que no fueron controvertidos por LV. En cambio, LV pretende que sin más prueba que las Órdenes Ejecutivas, se le exima del pago de renta, **sin demostrar el efecto que estas tuvieron en sus finanzas**. Como bien expresa **el apelado en su escrito de oposición** no puede sostenerse que un evento externo imposibilitó el cumplimiento de una obligación y simultáneamente se beneficia de ello. Tal circunstancia, debilita el argumento de que el cumplimiento de la obligación resultó extremadamente oneroso.

Respecto al segundo error, la parte apelante sostiene que incidió el foro primario al no eliminar determinaciones de hechos que aduce no constituyen hechos materiales ni pertinentes a la materia objeto de la *Sentencia Parcial* dictada. Respecto a este planteamiento, contrario a lo que adujo PlazaQ en su escrito en oposición, ante una revisión de una sentencia sumaria, le corresponde a esta *Curia* examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de las de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario.

En lo aquí concerniente, el apelante sostiene que las determinaciones de hechos números 32 y de la 37 a la 48 no son pertinentes por hacer referencia a personas naturales y jurídicas ajenas al pleito. Ello, a pesar de que las referidas determinaciones de hechos van dirigidas a probar que, durante el periodo en

controversia, LV continuó recibiendo beneficios económicos de terceros y aprovechando los espacios arrendados.

Las determinaciones de hechos señaladas por el apelante son las siguientes:

32. **Durante marzo, abril y mayo de 2020, cuando se suponía que no se trabajara físicamente en la oficina, la administradora de L&V estuvo bastantes horas trabajando desde la casa conectada a la computadora de la oficina**. Véase, Hecho Incontrovertido Núm. 20 de Sumaria Parcial.

[…]

37. **L&V subarrendó parte del espacio de su oficina a José Fidalgo (Kovack Securities) desde enero de 2020 hasta julio de 2022**. Véase, Hecho Incontrovertido Núm. 25 de Sumaria Parcial.

38. **Kovack Securities es una firma de inversión o de "financial advisors" que alquilaba un espacio a L&V.** Véase, Hecho Incontrovertido Núm. 26 de Sumaria Parcial.

39. **L&V emitió un reporte de "rent invoices" a José A. Fidalgo para el periodo de enero a diciembre de 2020**. Véase, Hecho Incontrovertido Núm. 27 de Sumaria Parcial.

40. **Para el periodo que José Fidalgo subarrendó el espacio de oficina a L&V, incluyendo enero de 2020 a julio de 2022, José Fidalgo pagó el arrendamiento completo a L&V y no tenía balance pendiente.** Véase, Hecho Incontrovertido Núm. 28 de Sumaria Parcial.

41. **Para marzo, abril y mayo de 2020, José A. Fidalgo pagó el canon de arrendamiento a L&V**. Véase, Hecho Incontrovertido Núm. 29 de Sumaria Parcial.

42. **L&V solicitó y recibió un préstamo del Paycheck Protection Program ("PPP").** Véase, Hecho Incontrovertido Núm. 30 de Sumaria Parcial.

43. **Los fondos del PPP estaban destinados para el pago de renta y el pago de salarios**. Véase, Hecho Incontrovertido Núm. 31 de Sumaria Parcial.

44. **FirstBank es cliente de L&V**. Véase, Hecho Incontrovertido Núm. 32 de Sumaria Parcial.

45. **L&V le provee servicios legales a FirstBank.** Véase, Hecho Incontrovertido Núm. 32 de Sumaria Parcial.

46. **Para marzo, abril y mayo de 2020 FirstBank era cliente de L&V**. Véase, Hecho Incontrovertido Núm. 34 de Sumaria Parcial.

47. **Las Órdenes Ejecutivas OE-2020-023, OE-2020-029 y OE-2020-033 expresamente eximieron del cierre de operaciones a las instituciones bancarias o financieras**. Véase, Hecho Incontrovertido Núm. 35 de Sumaria Parcial.

48. **L&V reconoce que FirstBank es una institución financiera que estaba exenta del cierre para el periodo de marzo, abril y mayo de 2020 y que se podían hacer cierres hipotecarios**. Véase, Hecho Incontrovertido Núm. 36 de Sumaria Parcial. [Énfasis nuestro]

De una simple lectura de las referidas determinaciones de hechos, colegimos que el foro primario no incurrió en error alguno al incluirlas, pues surge que las mismas son pertinentes. Esto, debido a que las mismas están relacionadas directamente con la controversia, es decir, el efecto de las Órdenes Ejecutivas en las finanzas de LV.

En resumen, las Órdenes Ejecutivas no tornaron extremadamente oneroso para LV cumplir con el pago del arrendamiento según pactado. Consecuentemente, los errores señalados no fueron cometidos.

## IV.

Por los fundamentos antes expuestos, confirmamos la *Sentencia Parcial* apelada.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones
